**IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF TEXAS AUSTIN DIVISION**

| | | |
|---|---|---|
| ALEXANDER E. JONES | § | |
| | § | |
| V. | § | A-18-CV-318-LY |
| | § | |
| KELLY R. JONES | § | |

**DEFENDANT'S OBJECTIONS TO THE REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE ANDREW W. AUSTIN**

**TO:    THE HONORABLE LEE YEAKEL UNITED STATES DISTRICT JUDGE**

NOW COMES Defendant, Kelly R. Jones, and files these Objections to the Report and Recommendation of United States Magistrate Judge Andrew W. Austin.

1)    Defendant incorporates all arguments set forth in her Notice of Removal, Dkt. 1, and Defendant's Response to Plaintiff's Motion to Remand, Dkt. 15.

2)    Defendant objects to the Magistrate's finding that "[t]his Court lacks jurisdiction to hear Jones' claims under the domestic relations exception to federal jurisdiction."

a)    As a preliminary matter, the Defendant is not asking this Court to "determine which parent should receive custody, what rights the noncustodial parent should have, how much child support should be paid and under what conditions, or whether a previous court's determination on these matters should be modified…" *See* Dkt. 16 at 2. Rather, the Defendant is asking this Court to retain the law suit, properly apply state law, and to dismiss the law suit with prejudice. Dkt. 15 at 1 ("…the Motion should be DENIED, and the state court family law matter should be DISMISSED with prejudice pursuant to Texas Family Code § 156.102.").

b)    As a response to the Magistrate's reliance upon the Domestic Relations Doctrine and in addition to arguments already made in the Defendant's Response to

Plaintiff's Motion to Remand, the Defendant contends that the Domestic Relations Doctrine is unconstitutional. In the alternative, the Defendant contends that post-*Obergefell* application of the Domestic Relations Doctrine to deny access to the federal court system is unconstitutional.

### *i*)      **The Domestic Relations Doctrine is unconstitutional.**

The Domestic Relations Exception was first handed down in 1858, by the Supreme Court as a proclamation without any meaningful reasoning or analysis. *See Barber v. Barber*, 62 U.S. 582, 584 (1858) ("We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony, either as an original proceeding in chancery or as an incident to divorce *a vinculo*, or to one from bed and board."). What appears to be missing from the robust debate surrounding the issue of the Domestic Relations Doctrine is a questioning of the Court's authority to disclaim jurisdiction or to carve out exceptions by proclamation. Quite frankly, no such authority exists.

The Domestic Relations exception to jurisdiction was a legal fiction from the beginning that was handed down in a rather rueful opinion necessitated by the political climate of the day and was never intended to withstand any amount of scrutiny. Right off the bat, the *Barber v. Barber* majority let it be known that the suit was not a domestic relations suit at all but rather a "full, faith and credit"[1] suit. *Barber v. Barber*, 62 U.S. at 584 ("Our first remark is—and we wish it to be remembered—that this is not a suit asking the court for the allowance of alimony.

---

[1] The Full Faith and Credit Clause of the United States Constitution requires states to respect the "public acts, records, and judicial proceedings of every other state," and in the *Barber v. Barber* case the husband had moved from New York to Wisconsin in an effort to avoid enforcement of the judgment. *See* U.S. CONST Art. IV, Sec 1; *Barber v. Barber*, 62 U.S. at 584 ("[The parties] were married in the State of New York, in the year 1840, where his

That has been done by a court of competent jurisdiction. The court in Wisconsin was asked to interfere to prevent that decree from being defeated by fraud."). At another point, one of the dissenters went so far as to proclaim that "as the jurisdiction of the chancery in England does not extend to or embrace the subjects of divorce and alimony, and as the jurisdiction of the courts of the United States in chancery is bounded by that of the chancery in England, all power or cognizance with respect to those subjects by the courts of the United States *in chancery* is equally excluded." *Id.* at 605.To understand why our revered Supreme Court would engage in such mockery, one must look beyond the four corners of the opinion and consider the circumstances of the times.

*Barber v. Barber* came before the Supreme Court of the United States in December of 1858, at a time when the impending civil war would have been seen as a foregone conclusion by seasoned members of the judiciary, and the absconding husband in the *Barber* case was not only a well-respected member of the New York bar but was also a county judge in Warren County, New York. While we may never know the exact reasons why he divorced his wife, relinquished his judgeship, and absconded to Wisconsin during these troubled times, we do know that he was a Republican during a time when being a Republican was synonymous with being an abolitionist. Butterfield, C.W., *The History of Dodge County, Wisconsin* 655-656 (1880)(attached at Tab A). Circumstantial evidence suggests that he was also friends with Martin Van Buren, a former president with hefty political ties who had just a decade earlier published

---

domicile then was, and continued to be until he left it for Wisconsin, *which was soon after a decree had been given for a divorce…with an allowance of alimony to be paid by him.*")(emphasis added).

an anti-slavery manifesto that eventually became known as the "Barnburner Manifesto." *Id.* at 655 ("[H]e…was appointed Judge by Martin Van Buren."); Wilentz, Sean, *The Rise of the American Democracy: Jefferson to Lincoln* 615 (W.W. Norton & Co., 2006) ("Later that winter, with the help of his son John and Samuel Tilden, Van Buren composed an address, soon to be known as the Barnburner Manifesto…")(attached at Tab B). To make matters worse, Samuel Tilden had a reputation for maliciously devastating the lives of political enemies. Chancellor, William Estabrook. *Our Presidents and Their Office; Including Parallel Lives of the Presidents of the People of the United States and of Several Contemporaries, and a History of the Presidency* 366 (1912)("There were good men among the Free Soilers, …Samuel J. Tilden, who *drove Tweed to well-deserved ruin*…")(emphasis added) (attached at Tab C).

It's pretty clear that there was a significant amount of politics at issue in the *Barber* decision that the Justices did not feel comfortable disclosing or confronting directly. They did try, however, to make the opinion easy to overrule. *See Barber v. Barber* at 584 ("Our first remark is—and we wish it to be remembered…"). What's not clear is why 160 years later, federal courts are still citing and giving effect to an opinion that should, at best, be remembered as an act of corruption adulterated by desperation. In fact, this was not the first time that this Court had misbehaved in this manner. Another such case coming out of this Court during Chief Justice Taney's tenure was the infamous *Dred Scott v. Sandford*. *See generally Scott v. Sandford*, 60 U.S. 393 (1857). The *Dred Scott* decision was eventually overturned by the Fourteenth Amendment following a

bloody civil war. While this Court could wait for the civil and human rights violations in the state courts to escalate to such a point as to incite the nation to civil war, to do so would be irresponsible. This Court does not need to continue endorsing bad law. "*Stare decisis* is not an inexorable command," and the Supreme Court has provided a path for "revisiting precedent." *State Oil Co. v. Khan,* 522 U.S. 3, 20 (1997)(internal quotation marks omitted); *Pearson v. Callahan*, 555 U.S. 223, 233 (2009) (quoting *State Oil Co. v. Khan,* 522 U.S. at 20).

## *ii)*     Post-*Obergefell* application of the Domestic Relations Doctrine to deny equal access to the federal court system presents an unconstitutional equal protection issue.

Arguments in support of the Defendant's position that post-*Obergefell* application of the Domestic Relations Doctrine to deny access to the federal court system presents a constitutional problem are well-developed and well-articulated by Bradley G. Silverman in his article entitled *Federal Questions and the Domestic Relations Exception*, **which is hereby incorporated by reference for all purposes**. Silverman, Bradley G., *Federal Questions and the Domestic-Relations Doctrine*, 125 Yale L.J. 1364 (2016)(attached at Tab D). In addition to the arguments made by Mr. Silverman, the Defendant further contends that the Supreme Court of the United States *de facto* overturned the Domestic Relations Doctrine in *Obergefell v. Hodges* when the Court used the Fourteenth Amendment to resolve a domestic dispute regarding the issuance of marriage decrees, which are inherently intertwined with intrafamily relations such as

divorce, alimony, and child custody. *See Obergefell v. Hodges*, 576 U.S.___ (2015), No. 14–556, slip op. (June 26, 2015). Having taken upon itself to hear and resolve the domestic dispute at issue in *Obergefell v. Hodges*, the Supreme Court has opened the door to an equal protection problem in cases whereby fundamental civil and human rights cannot be enforced in state court proceedings and the targeted litigant is not an LGBT member. Equal protection of the laws inherently requires access to the court system, and once the Court has provided access for one group of citizens, equal protection requires that access to the court be provide to all citizens. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 111 (1996)("This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts.")(quoting *Rinaldi v. Yeager,* 384 U.S. 305, 310 (1966)).

3)      Defendant objects to the Magistrate's finding that "[t][his Court does not have federal question jurisdiction over the dispute."

Citing dicta from a case that has been superseded by statute on other grounds, the Court found that it does not have federal question jurisdiction over this case simply because the Plaintiff did not plead the civil rights violations at issue. Dkt. 16 at 2 ("However, a court looks only at the plaintiff's well-pleaded complaint to determine if a claim arises under federal law.").; *see generally Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 10 (1983). A superseded case is hardly binding on this Court, and in any event, reliance on the Well-Pleaded Complaint rule is inappropriate for two reasons in this case. First, the Plaintiff's complaint is not well-pleaded. Second, the Court

has improperly applied the Well-Pleaded Complaint rule to a removal alleging fundamental civil rights violations.

The Plaintiff's failure to comply with a state law requiring an affidavit to be included with his pleadings before being allowed to proceed with his complaint is the primary justification for the Defendant's request for relief in this Court. Dkt. 1 at 2. This deficiency in the Plaintiff's complaint coupled with the state court's willingness to ignore the Defendant's statutory right to a dismissal after more than two years of ongoing unconstitutional abuses was a significant factor in Plaintiff's decision to seek federal protection. Dkt. 1 at 2. Given that the pleadings are, in fact, not well-pleaded, the Well-Pleaded Complaint rule simply does not apply to the facts of this case.

Even if the Plaintiff's complaint were well-pleaded, however, this Court may not ignore the Defendant's alleged fundamental civil rights violations simply because an abusive party has neither confessed to the abuses nor blown the whistle on the abusive state actors who have enabled the abuses to continue. Such a requirement would be absurd, especially in a case such as this one where gross civil and human rights violations, including the vexatious nature of the Plaintiff's use of the legal system and the state's willingness to allow the vexation to continue, are well-documented in the state court proceedings. *See* Dkts. 1, 2, 12, and 15. The Plaintiff's failure to include facts and significant case history in his pleadings that demonstrate these abuses should not be allowed to defeat the Defendant's fundamental civil and human rights.

Furthermore, the fact that the Defendant has not yet filed a separate suit regarding her civil rights claims is not relevant to the question of removal in this instance. The Defendant's civil rights claims against Judge Orlinda Naranjo and the entourage of court-

appointed professionals enlisted to subjugate the Defendant's civil and human rights have only recently accrued, and the Defendant is currently seeking redress of past violations through the state's appellate process. *See* Dkt. 1 at 2. In this case, the Defendant is seeking relief from new and imminent violations of her civil rights through the federal removal process and has invoked federal question jurisdiction reasoning that the state court's ongoing refusal to respect her civil and human rights gives this Court jurisdiction to intervene pursuant to its equitable authority under the United States Constitution to enforce the civil rights of citizens. U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. §1331. The Defendant's strategic choices are reasonable, and while the facts are explicably intertwined, one avenue for relief is not dependent upon the other.

4)      Defendant objects to the Magistrate's finding that a separate suit alleging civil rights claims "would almost assuredly be barred by the *Rooker–Feldman* doctrine."

While this finding may not be relevant to the decision at hand, the Defendant objects to this finding to ensure that a failure to object cannot be construed as waiver at a future proceeding. The *Rooker–Feldman* doctrine is not applicable for two reasons: 1) the Defendant is a state court winner who has been unable to have her win be acknowledge by the Court, and 2) the Defendant is not asking this Court to change the state court judgement. Rather, the Defendant is simply seeking dismissal of the Plaintiff's law suit pursuant to established state law, which is necessary to prevent new and imminent violations of the Defendants fundamental civil and human rights by a state actor (Judge Orlinda Naranjo). The Magistrate's finding with regard to the *Rooker– Feldman* doctrine suggests that he may not have understood the circumstances of this case or the nature of the Defendant's requests for relief. As such, the Defendant

respectfully requests preservation of her right of *de novo* review regarding this issue should the issue arise within a relevant context during a future proceeding.

5)      In addition to the evidence submitted at Dkt. 2 and Dkt. 12, the Defendant has gathered an additional 8361 pages of evidence and respectfully requests leave of this Court to file this evidence for the Court's consideration during its deliberations on this decision. In addition to the gathered evidence, the Defendant has requested a cost estimate for additional transcripts that will cost over $5000 to produce. Should this Court have any doubt as to the vexatious nature of the Plaintiff's course of conduct, Defendant further requests that this Court provide her with additional time to order all of the transcripts for this Court's consideration.

6)      Defendant objects to the Magistrate's conclusion that the Motion to seal is moot. Defendant respectfully requests that this Court consider unsealing all of the records and requests leave of this Court to file a Motion to Unseal the evidence in this case.

7)      In conclusion, Defendant respectfully moves this Court to reject the Report and Recommendation of United States Magistrate Judge Andrew W. Austin in its entirety, dismiss Plaintiff's Complaint with prejudice, and entertain a Motion to Unseal the evidence in this case.

Respectfully Submitted,

Kelly R. Jones
11601 Hwy 290 W
Suite A101, #307
Austin, TX 78737
Email: kelly@violetkelly.com
Phone: (512) 789-7130

By: */s/ Kelly R. Jones*
Kelly R. Jones
*Pro Se* Defendant

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered to each individual indicated below on or before the 23rd day of May, 2018, through the electronic filing manager.


*/s/ Kelly R. Jones*
Kelly R. Jones
*Pro Se* Defendant

**APPENDIX**
**TO DEFENDANT'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE ANDREW W. AUSTIN**

**TAB A –**
**Excerpt from Butterfield, C.W., *The History of Dodge County, Wisconsin* 655-656 (1880)**

**HENRY WINTER,** farmer, Sec. 32 ; P.O. Mayville ; born in Warren Co., N.J., Oct. 15, 1822 ; spent his early life and was educated in his native state ; came to Horicon, Dodge Co., October, 1849, and began as a cabinet-maker ; after five years, he bought a tract of wild land in Hubbard which he cleared off and disposed of ; Mr. Winter has cleared up over 700 acres of heavy timber since his settlement in Dodge Co.; he located on his present farm of 175 acres in 1867 ; he has improved this farm, erected the buildings and made a good home. He married Miss Margaret Banghart, of New Jersey, Nov. 3, 1843 ; they have four children—George, Elizabeth, Irvin and Franklin.   Mr. W. is a Democrat, and is independent of church or secret orders ; he is a successful farmer and stock-raiser ; has Durham grade cattle, Spanish Merino sheep, also horses and hogs ; the farm is in charge of his son George, as Mr. Winters has been a resident of Horicon since 1873.

**LE ROY WILLIAMS,** engineer, Mayville ; born in Washington Co., N. Y., Feb. 3, 1836 ; came to Beaver Dam, Wis., with his parents in 1842 ; after ten years, he settled as a farmer near Mayville ; at the age of 21, he began life as an engineer ; is now running a stationary engine in Roberts' elevator. He married, in 1854, Miss Susan French, of Mayville ; they have two children—Clyde, who at 17 is also an engineer, and Adelaide.   Mr. Williams is a stanch Republican in politics and is independent of church or secret societies.

**REV. SIMON G. WOELFEL,** Pastor of the Catholic congregation, Mayville ; born in Waukesha Co., Wis., March 2, 1846 ; he was educated in Milwaukee, Wis.; entered St. Francis Theological Seminary in 1859, and was ordained in 1868 ; was at first Assistant Pastor of Trinity Church, Milwaukee ; was Pastor of St. Louis' Church, Caledonia, Racine Co., Wis., about four years ; was three years in charge of a congregation at Grafton, Ozaukee Co.; took charge of three congregations in Dodge Co., and built the school building and parsonage at Lomira.   On account of ill health, Father Woelfel has relinquished all but his Mayville charge ; he has a pleasant home in the village, which he bought for his people ; the congregation number forty families.

**MATHEUS ZIEGLER,** saloon keeper and proprietor of Ziegler's Brewery, Mayville ; born Dec. 30, 1833, in Bavaria ; spent his early life in Bavaria and came to America September,1858; locating in Mayville he opened his saloon business in 1861 ; purchased his brewery in 1874 ; here he is doing a large business manufacturing from 300 to 400 barrels per annum.   Married Adelaide Dannhauser, 1855 ; they have five children—Louis, Amiel, Eugene, Clotilda and Adelaide.   Mr. Ziegler is a Democrat, has been a member of the Village Board several terms, and is now Village Treasurer ; he is one of the substantial business men of Mayville, where he has done business since 1858.

---

## HUBBARD TOWNSHIP.

**CHARLES ALLEN,** attorney and counselor at law, Horicon ; born in Morrisville, Madison Co., N. Y., June 28, 1836 ; was educated and studied law in his native State ; was admitted to the bar in Cooperstown, N. Y., at the age of 21 ; began practice in Vernon, Oneida Co., N. Y.; came to Mayville, Dodge Co., Wis., in the fall of 1858, and began practice ; here he resided a great part of the time until January, 1872, when he removed to Horicon.   Mr. Allen is a Democrat in politics, and was County Superintendent of Schools for the East District of Dodge Co. six years ; was appointed to fill the vacant District Attorney's office in 1872 ; has been Town Superintendent of Schools under the old system ; was President of the Village Board, Town Clerk, and is now Village Clerk.   He married Miss Eliza North Oct. 8, 1866 ; they have two children—Charles E. and Florence E.   Mr. Allen is an active member of Horicon Lodge, No. 40, A., F. & A. M.

**JUDGE HIRAM BARBER,** retired manufacturer, Horicon ; born in Washington Co., N. Y., Jan. 25, 1800 ; was educated in his native State, and lived on a farm until he was 22 ; when, though having no experience, he went into partnership with N. Atwell in the mercantile business ; had a successful career as a merchant about fifteen years, in Warren Co., N. Y.; afterward went into the real-estate and lumber business, and, in 1843, he disposed of about eight thousand acres of land, six saw-mills, and much other property, closed up his business and came West ; he studied law while in business, and, at the age of 29, was appointed Judge by Martin Van Buren ; held the office fourteen years, was elected Justice of the Peace in 1826, and served four years ; in the spring of 1844, the Judge settled in Dodge Co., Wis., and bought a large tract of wild land ; as he was five miles from a neighbor, he may fairly be called a pioneer ; from 1845 to 1848, he was engaged in the lumber trade in Milwaukee and Kenosha ; he built the old Court House in Juneau, in 1848, and the Juneau House in 1849, which he opened as a hotel in the spring of

Digitized by Google

1850; settled in Horicon in April, 1863; was with the Van Brunts in the manufacture of seeders until 1870, when he bought the factory; he continued the manufacture of seeders and farm wagons three years, then sold out the business to D. C. Van Brunt and his second son, R. S. Barber. The Judge is now resting from the labors of a long, busy and useful life; during an active business life of fifty-one years, he has always paid 100 cents on the dollar. He married Miss Salome Seelye April 6, 1824, who died June 12, 1839, leaving six children—Cynthia, David, R. S., Hannah, Hiram, Jr., and Mary S.; David is on the old homestead; R. S. is an owner of the seeder works; Hiram, Jr. is by profession a lawyer, and is now a Representative in Congress from the city of Chicago. Judge Barber is a Republican in politics, and is closely indentified with the history of Dodge Co.

**R. S. BARBER,** of Van Brunt & Barber, Horicon; born in Warren Co., N. Y., Jan. 22, 1828; spent his early life and was educated in his native State; came to Wisconsin in 1846, with his father, Judge Hiram Barber, and settled with him on a farm in Oak Grove, Dodge Co.; he made this his h me until 1852, when he went overland to California, and spent fourteen years mining and ranching in the Golden State; returning to Wisconsin, he remained about one year, then located at Omaha, Neb., where he was in the machine business abo t four years; spent the winter of 1870 in Council Bluffs, Iowa, and, in 1871, returned to Horicon and took an interest with his father in the seeder works. In company with D. C. Van Brunt and W. C. Wood, he bought the factory in 1873, the firm of Van Brunt & Barber doing the business since 1876. Mr. Barber is a Republican in politics. He married Miss Sarah Evans, of Milpitas, Cal., June 15, 1871; they have two children—Laurence E., born in Oak Grove, Dodge Co., Wis., June 20, 1872, and Alice, born in Horicon, Wis., Aug. 25, 1876.

**B. BECK,** boot and shoe maker and dealer; born in Germany in 1842; came to America in April, 1867, and settled in the town of Burnett, Dodge Co., Wis.; came to Horicon in September of the same year; he worked for William Lueck over a year, bought him out, and has since continued the business; built his large two-story brick store in 1874. Mr. Beck employs several workmen, and sells both custom and hand made goods. Married Miss Matilda Loehrke in 1870; they have four children—Amelia, Bertha, Louisa, and Minnie. Mr. Beck is a Democrat, and is now serving his fourth term as Trustee. Is a Lutheran. He invites the patronage of the people, and feels able to satisfy them as to durability and price of his work and goods.

**GEORGE H. BEERS,** mechanic; born in Danby, Tompkins Co., N. Y., March 25, 1815; was educated in his native State, and came to Juneau, Dodge Co., Wis., October 6, 1844. Early in 1845, he and Garry Taylor completed the Wild Cat saw-mill, Hustisford; settled in Horicon in October, 1846, and in 1847, with Mr. Taylor, built the old Horicon saw-mill, and may thus be fairly called a pioneer builder in the county. He married Miss Elmina L. Clinton in June, 1846; they have one daughter —Emma. Mr. Beers is a Republican, and was Village Clerk under the first charter election in Horicon. Is a member of the Horicon T. of H. Mr. Beers is a well and favorably known pioneer settler in this county.

**GEORGE D. BOUTON,** farmer, Secs. 4, 5 and 9; P. O. Horicon; born in Montgomery Co., N. Y., June 7, 1820; spent his early life and was educated in his native State, and settled in Williamstown, Dodge Co., in 1846, on a piece of wild land which he cleared and improved. In 1860, he settled on his present farm of forty acres, on which he raises full blood and grade Durham cattle, Southdown sheep, Berkshire and Poland hogs, also Morgan and Cloud horses. In January, 1850, he married Miss Maria M., daughter of Asahel Lukins; they have nine children—Eliza A., Julia A., Alyman P., Ida M., Lewis, Katie, George B., Willie, and Mabel. Alyman P., is now in charge of the homestead. Father and son are Democrats. Asahel Lukins was the first settler in Mayville, 1845, and on the death of his wife he sold the water-power to Alvin Foster.

**J. H. BROMLEY,** jeweler and photographer, Horicon; born in St. Lawrence Co., N. Y., April 1, 1839; was educated in New York State, and began learning the watchmakers' and jewelers' trade at 18; has followed the business twenty-two consecutive years. He resided about three years in Canada, and came to Sun Prairie, Wis., in 1871; in 1872, he removed to Beaver Dam, settling in Horicon in 1873; opened a photograph gallery in 1876, and has continued this with his jewelry business since. He married Miss Susan Bulson, of Oswego Co., N. Y., March 27, 1859; they lost a son Charles, March 17, 1860, and have two living children—Sarah and Clara; Mrs. Bromley learned dressmaking in her native State, and has worked at it more or less for seventeen years past; has followed the business steadily since 1873. Mr. Bromley is a Republican, and a charter member of Rock River T. of H.

**J. H. CHANDLER,** soap manufacturer, Horicon; born in Lower Canada May 1, 1825; son of John Chandler, who settled with his family on Sec. 1, town of Oak Grove, September, 1844; it was the first family to locate in the vicinity of Horicon, which did not then exist; J. Chandler and sons built

Digitized by Google

**TAB B –**
Excerpt from Wilentz, Sean, *The Rise of the American Democracy: Jefferson to Lincoln* 615
(W.W. Norton & Co., 2006)

Herkimer convention, and to prove their party loyalty, the Barnburners dropped the demand that any Democratic presidential candidate support nonextension of slavery. But the growing insurgency had also won over some of the older Barnburners, above all Martin Van Buren. Later that winter, with the help of his son John and Samuel Tilden, Van Buren composed an address, soon to be known as the Barnburner Manifesto, to be read to the Democrats of the state legislature. Although it backed no national candidate, the document emphatically endorsed the Wilmot Proviso and insisted that the Barnburner delegation alone be seated at the Baltimore convention.[29]

At last, the elder Van Buren had taken an unequivocal stance on the extension of slavery. "Free labor and slave labor . . . cannot flourish under the same laws," the manifesto asserted. "The wealthy capitalists who own slaves disdain manual labor, and the whites who are compelled to submit to it . . . cannot act on terms of equality with the masters." If he still refused to allow his own name to be put forward as a pro-Wilmot candidate at the Democratic national convention, Van Buren was eager to put his hard-fought wisdom in service to the dissidents' cause. To his son John, he stressed the importance of blending firmness with common sense. A "single rash and unadvised step" would make them look "indifferent to the general success of the party," motivated by a desire "to revenge past injuries or indulge personal piques." If not admitted to the convention on a full and equal footing with the other delegates, he counseled, the Barnburners should depart the proceedings, making clear that they did so "upon the ground of opposition to the extension of Slavery to free Territories." If admitted, they should make their case to the convention, but be prepared to support whatever candidate won the nomination—unless it was the now intolerable James K. Polk. In late May, the Barnburners traveled to Baltimore full of Van Buren's advice. They would insist on their legitimacy as the sole voice of the New York Democracy and fight to uphold nonextension of slavery—two matters that were now one and the same.[30]

The convention, starting on May 22, could not have gone worse for the Barnburners. After a day of preliminaries, the delegates took up the Barnburners' and Hunkers' rival credentials claims, and the hall turned into a cacophonous confusion. First the credentials committee attempted summarily to award New York's seats to the Hunkers. Led by the Barnburners' bitter opponent, William Lowndes Yancey of Alabama—who may have feared such a precedent might some day be used against pro-slavery men—the convention allowed the Barnburners to make their case. For four hours, the delegates listened to each side. Yancey then moved a resolution that denounced the Barnburners as "factious Whigs in disguise and abolitionists" and awarded the seats to the Hunkers, but after a break for dinner, he withdrew his motion. Finally, the convention decided, by a tiny majority, to allow both delegations to be seated and cast New York's votes jointly. The next

**TAB C –**
**Excerpt from Chancellor, William Estabrook,** *Our Presidents and Their Office* **366 (1912)**

son, "Prince John"; the latter by William L. Marcy of "spoils" fame.[1] The death of Jackson in 1845 widened the schism. In 1848, the party split, the Barnburners becoming Free Soilers because of their support of the Wilmot Proviso,[2] while the Hunkers secured control of the Democratic party machinery. In May of that year, they refused to stay in the National Convention at Baltimore, which nominated Lewis Cass for President.

FREE SOILERS NOMINATE VAN BUREN.—In August, 1848, at Buffalo, the Barnburners or Free Soilers held their first National Convention. Martin Van Buren was their choice for President, by a vote of 159 to 129 for John P. Hale. Charles Francis Adams, son of John Quincy Adams and grandson of John Adams, future Minister to England by choice of Abraham Lincoln, presided at the Convention and was chosen as Vice-Presidential candidate. These mighty words closed their platform: "We inscribe on our banner, Free Soil, Free Speech, Free Labor, and Free Men; and under it we will fight on and fight ever until a triumphant victory shall reward our exertions." To this day, soil and speech, labor and men have always been in peril.

There were good men among the Free Soilers,—David Dudley Field, later codifier of the laws of New York State; Joshua R. Giddings, Ohio's anti-slavery orator; David Wilmot, author of the Proviso that set man and man apart; Benjamin F. Butler, New York lawyer; Samuel J. Tilden, who drove Tweed to well-deserved ruin; Gerrit Smith, millionaire philanthropist and reformer; John A. Dix, destined to many high offices; and Charles Sumner, scholar, reformer, orator, political attorney for capitalists and fanatic.

ENTER ZACHARY TAYLOR.—The Whigs, setting aside Clay and Webster, had nominated rich, war-loving and pious Zachary Taylor, hero and victim of the glorious raid into Mexico. In the campaign, such men as William H. Seward and Horace Greeley, professing to choose between Cass, Taylor, and Van Buren, supported Taylor; and Abraham Lincoln, fresh from his single term in Congress, stumped New England in favor of the slaveholding General. Oh, consistency! oh, intellect of man! They weren't sure of the sincerity of Van Buren; and

[1] See pp. 330, 331, *supra*.     [2] See pp. 394, 395, *infra*.

**TAB D –**
**Silverman, Bradley G., *Federal Questions and the Domestic-Relations Doctrine*,**
**125 Yale L.J. 1364 (2016)**

# THE YALE LAW JOURNAL

**BRADLEY G. SILVERMAN**

# Federal Questions and the Domestic-Relations Exception

**ABSTRACT.** The domestic-relations exception to federal jurisdiction prohibits federal courts from hearing cases involving family-law questions within the traditional authority of the states. Since the Supreme Court first articulated the exception in 1858, the scope of the doctrine has remained unclear; in particular, confusion persists over whether it applies only to diversity cases, or to federal questions as well. This Note argues that the domestic-relations exception does not, as a matter of positive law, apply to federal-question cases. Applying the exception to bar federal courts from jurisdiction over bona fide federal questions would violate Article III, which endows federal courts with jurisdiction over all federal-question cases in law or equity. Additionally, the federal-question jurisdiction statute is best read as reflecting a congressional intent that federal jurisdiction extend to domestic-relations matters that raise questions of federal law. Federal courts have the authority to resolve important and timely questions of federal law. The domestic-relations exception should not be misconstrued to stand in their way.

**AUTHOR.** Yale Law School, J.D. expected 2016. I am grateful to Akhil Reed Amar, Robert Black, Philip C. Bobbitt, Nicholas Parrillo, Allison Anna Tait, and Alec Webley for their help, support, and feedback. I also thank Jane Ostrager, Hyungwoo Lee, Marissa Roy, Elizabeth Ingriselli, Charlie Bridge, Rebecca Lee, Michael Clemente, and the extraordinary editors of the *Yale Law Journal* for their invaluable suggestions and tireless efforts over the course of the production process. All errors are entirely my own. This Note is dedicated to Steven G. Calabresi, the epitome of a wise, warmhearted, and generous mentor, from whom I have learned so much and still have so much to learn.



## NOTE CONTENTS

INTRODUCTION                                                                          1366

I.   BACKGROUND ON THE DOMESTIC-RELATIONS EXCEPTION                                   1372
     A.  The Exception's Provenance and Competing Rationales                          1372
     B.  Confusion Across and Within the Circuits                                     1381

II.  THE CASE FOR APPLYING THE EXCEPTION TO FEDERAL QUESTIONS                         1388
     A.  The Originalist Argument                                                     1389
     B.  Federalism-Based Arguments                                                   1391
     C.  The Precedential Argument                                                    1395

III. THE CASE AGAINST APPLYING THE EXCEPTION TO FEDERAL QUESTIONS                     1397
     A.  The Constitutional Argument: Applying the Exception to Federal
         Questions Would Violate Article III                                          1398
         1.  Federal Questions Involving Domestic Relations Are Cases in "Law" or
             "Equity"                                                                 1398
         2.  Appeals from State Court Federal-Question Judgments Must Always
             Lie in Federal Court                                                     1402
         3.  The Domestic-Relations Exception as an Abstention Doctrine               1413
     B.  The Statutory Argument: Under *Ankenbrandt*, the Federal Jurisdictional
         Statutes Are Best Read as Not Creating a Domestic-Relations Exception
         to Federal-Question Jurisdiction                                             1417
     C.  The Federalism-Based Argument: Applying the Exception to Federal
         Questions Undermines Federalism Values                                       1423

CONCLUSION                                                                            1426

THE YALE LAW JOURNAL                                    125:1364   2016

## INTRODUCTION

Under the domestic-relations exception to federal jurisdiction, federal courts lack the power to hear certain cases involving family-law questions that fall within the traditional authority of the states.[1] The exception was first articulated in 1858: in *Barber v. Barber*, the Supreme Court "disclaim[ed] altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony."[2] Thirty-two years later, the Court expanded the exception to reach "[t]he whole subject of the domestic relations of husband and wife, parent and child," which, the Court said, "belongs to the laws of the States and not to the laws of the United States."[3] Despite its long pedigree, the exception's scope remains unsettled in the doctrine. In particular, confusion persists about whether the exception extends to federal-question cases, or only to diversity cases. This Note argues that, for both constitutional and statutory reasons, courts may not invoke the domestic-relations exception in federal-question cases.

Today, some courts apply the domestic-relations exception to federal questions; others limit it to diversity cases.[4] The Supreme Court's most recent treatments of the exception's scope do not provide clear guidance. *Ankenbrandt v. Richards*, decided in 1992, purported to limit the exception to requests for "divorce, alimony, and child custody decrees."[5] But in *Elk Grove Unified School District v. Newdow*,[6] the Court "provid[ed] . . . powerful language supporting a domestic relations exception for federal questions."[7] *Newdow* implied that federal courts should hear cases raising "delicate issues of domestic relations" only in "rare instances," and only when "*necessary* to answer a substantial

---

1. 13E Charles Alan Wright et al., Federal Practice and Procedure: Jurisdiction and Related Matters § 3609 (3d ed. 1998).

2. Barber v. Barber *ex rel.* Cronkhite, 62 U.S. (21 How.) 582, 584 (1858).

3. *In re* Burrus, 136 U.S. 586, 593-94 (1890).

4. 13E Wright et al., *supra* note 1, § 3609; *see also infra* Section I.B.

5. 504 U.S. 689, 703 (1992). The Court would later emphasize that *Ankenbrandt* took a narrow view of the exception: "While recognizing the 'special proficiency developed by state tribunals . . . in handling issues that arise in the granting of [divorce, alimony, and child custody] decrees,' we viewed federal courts as equally equipped to deal with complaints alleging the commission of torts." Marshall v. Marshall, 547 U.S. 293, 308 (2006) (citation omitted).

6. 542 U.S. 1 (2004), *abrogated by* Lexmark Int'l v. Static Control Components, Inc., 134 S. Ct. 1377, 1387-88 (2014).

7. Meredith Johnson Harbach, *Is the Family a Federal Question?*, 66 Wash. & Lee L. Rev. 131, 143 (2009).

federal question that transcends or exists *apart from* the family law issue."[8] In many other cases that would seem to implicate the exception, the Court has simply been silent about its application.[9]

In recent years, as the constitutionality of same-sex marriage wound its way to the Supreme Court, lower federal courts repeatedly grappled with the question of whether the domestic-relations exception imposed a barrier to their adjudication of the issue. Four federal district courts held that the exception did not prevent them from deciding same-sex marriage challenges on the merits,[10] while three judges on the Ninth Circuit reached the opposite conclusion, asserting that "because . . . the definition and recognition of marriage . . . are committed to the states, federal courts ought to refrain from intruding into this core area of state sovereignty."[11] Amici urging federal courts to not hear challenges to same-sex marriage bans repeatedly invoked the exception as well.[12] Seeking to stay a 2014 district court ruling requiring his

---

8.  *Newdow*, 542 U.S. at 13 (emphasis added).

9.  *See infra* notes 285-303 and accompanying text.

10.  *See* Rosenbrahn v. Daugaard, 61 F. Supp. 3d 862, 867-68 (D.S.D. 2015); Condon v. Haley, 21 F. Supp. 3d 572, 584 (D.S.C. 2014); Marie v. Moser, 65 F. Supp. 3d 1175, 1195 (D. Kan. 2014); McGee v. Cole, 993 F. Supp. 2d 639, 646 (S.D. W. Va. 2014). Appeals from these decisions did not generate further holdings or dicta on the subject.

11.  Latta v. Otter, 779 F.3d 902, 913 (9th Cir. 2015) (O'Scannlain, J., dissenting from denial of rehearing en banc). The dissenting judges observed that "[f]ederal judges have used various doctrinal mechanisms to refrain from intruding into the uncharted waters of state domestic relations law," including the domestic-relations exception. *Id.* at 912-13. "Here," the dissenters said, "our court need not decide which of these many potential sources of restraint we should draw from." *Id.* at 913. This makes clear that they viewed the exception as applicable to the case. The majority opinion did not hold that the exception did not apply—it simply did not address the issue.

12.  *See* Brief Amicus Curiae of Eagle Forum Education & Legal Defense Fund, Inc., in Support of Neither Party at 9-11, DeBoer v. Snyder, 135 S. Ct. 2584 (2015) (No. 14-571), 2014 WL 6998392, at *9-11 [hereinafter Eagle Forum Brief]; Brief of Amici Curiae Mae Kuykendall, David Upham & Michael Worley in Support of Neither Party and Urging Affirmance on Question 1 at 2-3, Obergefell v. Hodges, 135 S. Ct. 2584 (2015) (No. 14-556), 2015 WL 1004711, at *2-3 [hereinafter Kuykendall et al. Brief]. Similarly, state amici repeatedly invoked the domestic-relations exception to argue that federal courts should not exercise jurisdiction over the challenge to California's Proposition 8. *See* Brief Addressing the Merits of the States of Indiana, Virginia, Alabama, Alaska, Arizona, Colorado, Georgia, Idaho, Kansas, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia & Wisconsin as Amici Curiae in Support of the Petitioners at 5-7, Hollingsworth v. Perry, 133 S. Ct. 2652 (2013) (No. 12-144), 2013 WL 416198, at *5-7 [hereinafter Brief of States II]; Brief of States of Indiana, Virginia, Louisiana, Michigan, Alabama, Alaska, Florida, Idaho, Nebraska, Pennsylvania, South Carolina, Utah & Wyoming as Amici Curiae in Support of Defendants-Intervenors-Appellants Dennis Hollingsworth et al. and in Support of Reversal at 3-6, Perry v. Brown, 671 F.3d 1052 (9th Cir. 2012) (No. 10-16696), 2010 WL 4075743 [hereinafter Brief of States I]. The Supreme

state to recognize same-sex marriages, the Attorney General of South Carolina filed an emergency application with John Roberts, Chief Justice of the United States and the Circuit Justice for the Fourth Circuit.[13] The South Carolina Attorney General submitted that the exception precluded the district court from hearing the case.[14] The Supreme Court denied the motion,[15] prompting Justices Scalia and Thomas to dissent.[16]

Ultimately, in *Obergefell v. Hodges*,[17] the Supreme Court held that the U.S. Constitution requires states to license and recognize same-sex marriages. But the Court failed to address this potential jurisdictional stumbling block—a puzzling omission, given the attention the issue received from lower courts, amici, and commentators. The fact that the Court reached a decision on the merits might inspire doubt that the exception applies to federal questions, but *Obergefell* left the issue unsettled. To imagine otherwise would impute undue authority to an unstated inference. *Obergefell* did not purport to overrule or limit *Newdow*, which remains good law, and the decision is unlikely to end the uncertainty over whether the domestic-relations exception applies to federal questions.[18]

---

Court ultimately decided that it lacked jurisdiction on standing grounds, without reaching the domestic-relations question. *See Hollingsworth*, 133 S. Ct. at 2668.

**13.** Emergency Application To Stay United States District Court Order, Wilson v. Condon, 135 S. Ct. 702 (2014) (No. 14A533) [hereinafter Emergency Application]; *see also* Condon v. Haley, 21 F. Supp. 3d 572 (D.S.C. 2014).

**14.** *See* Emergency Application, *supra* note 13, at 6-18.

**15.** Wilson v. Condon, 135 S. Ct. 702 (2014). A denial of an application to stay is not a decision on the merits of the underlying legal claim.

**16.** *Id.* (Scalia & Thomas, JJ., dissenting).

**17.** 135 S. Ct. 2584 (2015).

**18.** A federal judge sitting in a circuit that has squarely held that the exception does apply to federal questions would be quite justified in concluding that *Obergefell* did not speak to the issue. The Supreme Court has admonished lower courts not to read its opinions like tea leaves and divine unspoken doctrinal developments and has emphasized that summary dispositions continue to be "controlling precedent, unless and until re-examined by [the] Court [itself]." Tully v. Griffin, Inc., 429 U.S. 68, 74 (1976); *see also* Hicks v. Miranda, 422 U.S. 332, 345-46 (1975) (stating that "lower courts are bound by summary decisions by this Court" until the Court says otherwise); Ohio *ex rel.* Eaton v. Price, 360 U.S. 246, 247 (1959) ("Votes to affirm summarily, and to dismiss for want of a substantial federal question, it hardly needs comment, are votes on the merits of a case . . . ."). The Court has held that lower courts must treat summary dispositions as merits decisions to "prevent [them] from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Mandel v. Bradley, 432 U.S. 173, 176 (1977). Lower courts are bound by the Court's precedents even when they are in tension with newer ones, "leaving to [the Supreme] Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of

FEDERAL QUESTIONS AND THE DOMESTIC-RELATIONS EXCEPTION

Indeed, confusion about the exception's scope will almost certainly persist in the post-*Obergefell* world. Federal courts will continue to encounter litigation at the intersection of federal law and the family. *Obergefell*'s enduring legitimacy itself requires consensus that the domestic-relations exception does not deprive federal courts of jurisdiction to decide federal questions affecting family relations. Courts that apply the exception to federal questions will erode confidence in that decision. Later cases that suggest that the disappointed litigants, dissenting judges, amici, and commentators in the same-sex marriage cases were actually correct about the domestic-relations exception—or even that there is genuine doubt that the objectors were wrong—will undermine *Obergefell*'s legitimacy, suggesting that the ruling was as lawless as its critics claimed.[19]

Academics have fared no better than jurists in reaching consensus on the domestic-relations exception.[20] Some have called for its abolition altogether.[21]

decisions, the Court of Appeals should follow the case which directly controls . . . ."); *see also* Agostini v. Felton, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.").

For this reason, it is likely that at least some lower federal courts continue to apply the domestic-relations exception to federal questions. Consider that in *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014), the Sixth Circuit refused to strike down Michigan's ban on same-sex marriage because the Supreme Court had rejected an indistinguishable challenge in a summary disposition that it issued in 1972 and never overruled. *See* Baker v. Nelson, 409 U.S. 810 (1972). In defending its decision, the Sixth Circuit argued that giving appellate courts too free a hand to infer that the Supreme Court has stealthily overruled one of its summary dispositions "returns us to a world in which the lower courts may anticipatorily overrule all manner of Supreme Court decisions based on counting-to-five predictions, perceived trajectories in the caselaw, or, worst of all, new appointments to the Court." *DeBoer*, 772 F.3d at 401. For similar reasons, lower federal judges may be reluctant to conclude that *Obergefell* held the domestic-relations exception inapplicable to federal questions.

19.  *See, e.g.*, Ted Cruz, *Constitutional Remedies to a Lawless Supreme Court*, NAT'L REV. (June 26, 2015, 5:39 PM), http://www.nationalreview.com/article/420409/ted-cruz-supreme-court -constitutional-amendment [http://perma.cc/LK9K-M9HC] (describing *Obergefell* as "judicial activism" and "lawless"); Press Release, Ken Paxton, Att'y Gen., Tex., Attorney General Paxton: Religious Liberties of Texas Public Officials Remain Constitutionally Protected After Obergefell v. Hodges (June 28, 2015), http://www.texasattorneygeneral .gov/static/5144.html [http://perma.cc/R47V-N8GB] (describing *Obergefell* as a "lawless ruling").

20.  *See, e.g.*, Michael Ashley Stein, *The Domestic Relations Exception to Federal Jurisdiction: Rethinking an Unsettled Federal Courts Doctrine*, 36 B.C. L. REV. 669, 670 (1995) (noting the existence of widespread disagreement over "the validity and scope of a domestic relations exception to either diversity or federal question jurisdiction").

21.  *See, e.g.*, Emily J. Sack, *The Domestic Relations Exception, Domestic Violence, and Equal Access to Federal Courts*, 84 WASH. U. L. REV. 1441, 1466-73 (2006); Barbara Freedman Wand, *A Call*

Scholarly commentary on the exception can be grouped into two main strands: (1) normative critiques that focus on whether the exception is fair or desirable as a policy matter[22] and (2) efforts to cast doubt on the exception's historicity[23] and on other legal justifications offered by its defenders.[24] But existing attacks on the exception's historicity are underdeveloped, buried in a sea of normative arguments, and even these critics have not argued that the Constitution *precludes* applying the exception to federal questions. Recently, Steven G. Calabresi and Genna L. Sinel undertook an examination of the exception's historicity and concluded both that the exception is historically sound,[25] and that it would have been originally understood to apply to federal-question cases as a constitutional[26] and statutory matter.[27]

---

for the Repudiation of the Domestic Relations Exception to Federal Jurisdiction, 30 VILL. L. REV. 307, 401 (1985); Mark Stephen Poker, Comment, *A Proposal for the Abolition of the Domestic Relations Exception*, 71 MARQ. L. REV. 141, 162-64 (1987).

22. *See, e.g.*, Harbach, *supra* note 7, at 139; Sharon Elizabeth Rush, *Domestic Relations Law: Federal Jurisdiction and State Sovereignty in Perspective*, 60 NOTRE DAME L. REV. 1 (1984); Sack, *supra* note 21, at 1490; Stein, *supra* note 20; Wand, *supra* note 21; Bonnie Moore, Comment, *Federal Jurisdiction and the Domestic Relations Exception: A Search for Parameters*, 31 UCLA L. REV. 843 (1984); Poker, *supra* note 21, at 165; Rebecca E. Swenson, Note, *Application of the Federal Abstention Doctrines to the Domestic Relations Exception to Federal Diversity Jurisdiction*, 1983 DUKE L.J. 1095.

23. *See, e.g.*, Sack, *supra* note 21, at 1480 ("[T]he historical rationale . . . is open to serious question and [prior to *Ankenbrandt*] had not consistently been the basis for the Court's previous holdings in the area."); Poker, *supra* note 21, at 164 ("The domestic relations exception has dubious historical origins.").

24. *See, e.g.*, Poker, *supra* note 21, at 159-62 (criticizing federalism, separation-of-powers, statutory, and policy arguments in favor of the exception).

25. Steven G. Calabresi & Genna Sinel, *The Gay Marriage Cases and Federal Jurisdiction: On Why the Domestic Relations Exception to Federal Jurisdiction Is Archaic and Should Be Overruled*, 70 U. MIAMI L. REV. (forthcoming 2016).

26. *Id.* (manuscript at 5-6).

27. *Id.* (manuscript at 38-43). Calabresi and Sinel argue that "Congress and the Supreme Court *could and should* abolish the domestic relations exception to federal jurisdiction," but believe that until Congress does so, the exception applies to federal questions. *Id.* (manuscript at 55) (emphasis added).

   It is worth noting that while Calabresi and Sinel's work is the only comprehensive scholarly treatment of the domestic-relations exception in the context of same-sex marriage, others have addressed the intersection of these two issues. *See, e.g.*, William C. Duncan, *Avoidance Strategy: Same-Sex Marriage Litigation and the Federal Courts*, 29 CAMPBELL L. REV. 29, 35 (2006); Harbach, *supra* note 7, at 158; Nathan M. Brandenburg, Note, *Preachers, Politicians, and Same-Sex Couples: Challenging Same-Sex Civil Unions and Implications on Interstate Recognition*, 91 IOWA L. REV. 319, 345 (2005); Michael McConnell, *The Constitution and Same-Sex Marriage*, WALL ST. J. (Mar. 21, 2013), http://www .wsj.com/articles/SB10001424127887324281004578354300151597848  [http://perma.cc/9KLN -NUMV]; sources cited *infra* note 101.

FEDERAL QUESTIONS AND THE DOMESTIC-RELATIONS EXCEPTION

This Note stakes out a different position, arguing that the domestic-relations exception does not, as a matter of positive law, apply to federal-question cases. First, the Note explains why applying the exception to bar federal courts from jurisdiction over bona fide federal questions would violate Article III,[28] which endows federal courts with jurisdiction over *all* federal-question cases in law or equity. As a constitutional matter, federal jurisdiction extends to all domestic-relations cases raising federal questions.

Second, this Note argues that under the logic of *Ankenbrandt*, the federal question jurisdiction statute[29] is best read as reflecting a congressional intent that federal jurisdiction extend to domestic relations matters that raise questions of federal law. Even if Congress *had* previously curtailed statutory jurisdiction over federal domestic-relations questions, Congress has subsequently restored this jurisdiction.

This Note does not purport to provide a comprehensive treatment of the domestic-relations exception; it advances no claim as to whether the exception is valid with respect to diversity jurisdiction. This Note addresses only federal-question jurisdiction, arguing that courts should reject the domestic-relations exception in the federal-question context as a matter of constitutional law and statutory interpretation.

This Note proceeds in four Parts. Part I briefly discusses the domestic-relations exception's provenance and rationales, as well as the current state of the doctrine. After recounting the exception's doctrinal origins and development, this Part documents confusion in the circuits over the exception's breadth.

Part II explains the strongest arguments for applying the domestic-relations exception in federal-question cases. First, there is an originalist argument that federal courts possess only the jurisdiction exercised by the English courts of law or equity, which lacked power to hear marital cases.

---

**28.** Article III provides:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; — to all Cases affecting Ambassadors, other public Ministers and Consuls; — to all Cases of admiralty and maritime Jurisdiction; — to Controversies to which the United States shall be a Party; — to Controversies between two or more States; — between a State and Citizens of another state, — between Citizens of different States, — between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. CONST. art. III, § 2, cl. 1.

**29.** 28 U.S.C. § 1331 (2012) ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

Second, there is a federalism-based argument that states have an important interest in exclusive jurisdiction over domestic-relations matters, which fall within the core of state authority. Finally, there is an argument that early Supreme Court precedents confirm that the exception has been applied in federal-question cases since its inception.

Part III demonstrates why these arguments fail. Applying the exception to federal questions would violate the text, history, and structural logic of Article III. Article III mandates that whenever a state court adjudicates a federal question, appeal must lie in the federal courts—including, ultimately, the Supreme Court. Early precedents to the contrary provide little reasoning for their holdings, and are thus entitled to little weight. Moreover, under *Ankenbrandt*'s own logic, the federal-question statute is best read not to embody a domestic-relations exception to federal-question jurisdiction. Finally, federalism does not offer sufficient reasons to apply the exception to federal questions, as values of federalism and parity between state and federal courts are also served by permitting both types of courts to adjudicate federal questions that involve domestic relations.

The Conclusion looks ahead to the future litigation that will further heighten the need to recognize conclusively that the domestic-relations exception does not deprive federal courts of jurisdiction to resolve federal questions. This Note's conclusions are not cabined to the issue of same-sex marriage; they ring true across all federal questions involving domestic issues. Federal courts have the authority to resolve important and timely questions of federal law. The domestic-relations exception should not be misconstrued to stand in their way.

## I.  BACKGROUND ON THE DOMESTIC-RELATIONS EXCEPTION

### A.  *The Exception's Provenance and Competing Rationales*

This Part describes the doctrinal development of the domestic-relations exception. It reveals that the scope of the exception has been uncertain since its inception. Similarly, no single theory of the exception's provenance emerges from the case law. Instead, the Supreme Court has offered unrelated, sometimes conflicting justifications for applying the exception. Some precedents seem to rest on a constitutional foundation, while others are clearly statutory. This Note later argues that neither constitutional nor statutory law provides a true foundation for the domestic-relations exception.

The Supreme Court first articulated the domestic-relations exception in 1858 in *Barber v. Barber*, a diversity suit brought by a wife against her husband

to enforce a state court's alimony award.[30] The New York Court of Chancery had issued a divorce decree requiring the husband to pay his wife a yearly allowance of $360, but the husband left the state and refused to comply with the order.[31] His wife sued him in federal court in Wisconsin to enforce the decree.[32] The Supreme Court ruled that the district court had jurisdiction to hear the case, but only because the plaintiff sought "to prevent that decree from being defeated by fraud," not to seek alimony support in the first place.[33] The Court then stated its now-famous dictum: "We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony, either as an original proceeding in chancery or as an incident to divorce . . . ."[34]

The *Barber* Court thus asserted a proto-domestic-relations exception to federal court jurisdiction that was limited to divorce and alimony. However, it did so only in dictum in the context of a diversity, not federal-question, case. Moreover, the Court did not supply any reasoning to support its pronouncement. Justice Daniel's dissenting opinion, however, offered a historical rationale for the domestic-relations exception. The dissent claimed that U.S. courts sitting in equity could exercise only the jurisdiction that was enjoyed by the English chancery courts, which did not extend to suits for divorce or alimony.[35] The majority and the dissent agreed that a domestic-relations exception existed, but, unlike the majority, Justice Daniel would have applied it in the case at hand.[36] Many years later, the Court would endorse the dissent's rationale, asserting that the majority "did not disagree with [Justice

---

30.  Barber v. Barber *ex rel.* Cronkhite, 62 U.S. (21 How.) 582, 583-84 (1858).

31.  *Id.* at 585.

32.  *Id.* at 586.

33.  *Id.* at 584.

34.  *Id.*

35.  *Id.* at 605 (Daniel, J., dissenting) ("[A]s the jurisdiction of the chancery in England does not extend to or embrace the subjects of divorce and alimony, and as the jurisdiction of the courts of the United States in chancery is bounded by that of the chancery in England, all power or cognizance with respect to those subjects by the courts of the United States *in chancery* is equally excluded.").

36.  *Compare id.* at 599-600 (majority opinion) (holding that "the court below has not committed error in sustaining its jurisdiction over this cause, nor in the decree which it has made"), *with id.* at 600 (Daniel, J., dissenting) (disagreeing with the majority on whether federal courts had power "to adjudicate upon a controversy and between parties such as are presented by the record before us").

Daniel's] reason for accepting the jurisdictional limitation," but only with his view of its scope.[37]

Thirty-two years later, the Court "significantly expanded *Barber*'s domestic-relations exception."[38] In *In re Burrus*,[39] a father had obtained a child custody order, via a writ of habeas corpus, from the U.S. district court; the child had been in her grandparents' custody, and the grandparents later violated the order by retaking custody of her.[40] The district court imprisoned the grandfather for contempt of court.[41] He sought relief from his imprisonment on the ground that the district court lacked jurisdiction to grant the father's habeas petition in the first place.[42] The Supreme Court agreed.[43] Now addressing a federal-question case, the Court articulated a domestic-relations exception with a potentially expansive scope. The Court stated that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."[44] It further suggested that domestic-relations cases generally do not "justif[y] the exercise of federal authority."[45] As in *Barber*, the Court gave no reason for this rule,[46] nor did it indicate whether the rule rested on a constitutional, statutory, or prudential basis.

Three other cases decided shortly thereafter bore on the source and scope of the domestic-relations exception. *Perrine v. Slack*,[47] decided in 1896, was another habeas action. A mother sought a writ of habeas corpus to obtain custody of her children from her deceased husband's sister and the sister's

---

**37.** Ankenbrandt v. Richards, 504 U.S. 689, 699 (1992) ("Because the *Barber* Court did not disagree with this reason for accepting the jurisdictional limitation over the issuance of divorce and alimony decrees, it may be inferred fairly that the jurisdictional limitation recognized by the Court rested on this statutory basis and that the disagreement between the Court and the dissenters thus centered only on the extent of the limitation.").

**38.** Poker, *supra* note 21, at 145.

**39.** 136 U.S. 586 (1890).

**40.** *Id.* at 588-89.

**41.** *Id.*

**42.** *Id.* at 589.

**43.** *Id.* at 594 ("As to the right to the control and possession of this child, as it is contested by its father and its grandfather, it is one in regard to which neither the Congress of the United States nor any authority of the United States has any special jurisdiction.").

**44.** *Id.* at 593-94.

**45.** *Id.* at 591.

**46.** Poker, *supra* note 21, at 145 ("[T]he *Burrus* opinion did not provide a rationale for the dictum.").

**47.** 164 U.S. 452 (1896).

husband.[48] The Court held that no federal jurisdiction existed because "the matter in dispute is of such a nature as to be incapable of being reduced to any pecuniary standard of value,"[49] presumably meaning that the case could not satisfy the statutory amount-in-controversy requirement to sustain federal jurisdiction.[50]

*Simms v. Simms*, decided on appeal from Arizona's territorial court in 1899, held that federal circuit courts lacked jurisdiction to review divorce and alimony orders issued by the territorial courts, relying on *Barber*'s disclaimer of jurisdiction over suits involving divorce and alimony.[51] However, *Simms* asserted that the Arizona district court *did* have jurisdiction over domestic suits.[52] In the federal territories, the Court reasoned, Congress "has full legislative power over all subjects upon which the legislature of a State might

**48.** *Id.* at 453.

**49.** *Id.* at 454.

**50.** Though the Court did not overtly speak of the amount-in-controversy requirement, it followed this point with a citation to *Barry v. Mercein*, 46 U.S. (5 How.) 103 (1847). *Perrine*, 164 U.S. at 454. In *Barry*, the Court held that pursuant to section 22 of the Judiciary Act of 1789, it lacked jurisdiction in "cases to which no test of money value can be applied." *Barry*, 46 U.S. at 120; *see* Judiciary Act of 1789, ch. 20, § 22, 1 Stat. 73, 84 ("[F]inal decrees and judgments in civil actions in a district court, where the matter in dispute exceeds the sum or value of fifty dollars, exclusive of costs, may be reexamined, and reversed or affirmed in a circuit court . . . ."). *Perrine* also invoked "the reasons given, and . . . the authorities cited in" another case, *Chapman v. United States*, 164 U.S. 436 (1896). *Perrine*, 164 U.S. at 454. In *Chapman*, the Court dismissed a criminal appeal on the grounds that the five thousand dollar amount-in-controversy requirement of the statute establishing the Court of Appeals of the District of Columbia had not been satisfied. 164 U.S. at 446-47, 452; *see* Act of Feb. 9, 1893, ch. 74, § 8, 27 Stat. 434, 436.

    *Perrine* came to the Supreme Court by federal-question jurisdiction, as the writ had been sought from a District of Columbia trial court. Until 1980, 28 U.S.C. § 1331, the federal-question jurisdiction statute, contained the same ten thousand dollar amount-in-controversy requirement as 28 U.S.C. § 1332, the diversity-jurisdiction statute. *See* Federal Question Jurisdictional Amendments Act of 1980, Pub. L. No. 96-486, § 2(a), 94 Stat. 2369, 2369 (codified at 28 U.S.C. § 1331 (2012)). As such, plaintiffs who wished to litigate federal questions involving claims of less than ten thousand dollars had to rely on more specific jurisdictional provisions that contained no amount-in-controversy requirements. They often turned to 28 U.S.C. § 1337, which gives district courts "original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies" and which imposes no amount-in-controversy requirement in most scenarios. 28 U.S.C. § 1337(a). "Congress' elimination of § 1331's amount in controversy requirement rendered the grant of jurisdiction in § 1337 superfluous." ErieNet, Inc. v. Velocity Net, Inc., 156 F.3d 513, 520 (3d Cir. 1998) ("Accordingly, any action that could be brought in federal court under § 1337 could also be brought under § 1331.").

**51.** 175 U.S. 162, 167 (1899).

**52.** *Id.* at 167-68.

legislate within the State."[53] In exercising that power, the Court said, Congress could vest territorial courts with jurisdiction over domestic-relations disputes.[54]

The Court reaffirmed that the domestic-relations exception does not reach territorial courts in *De La Rama v. De La Rama*, decided in 1906 on appeal from the Supreme Court of the Philippine Islands.[55] It gave two justifications for the exception. First, it reasoned "that the husband and wife cannot usually be citizens of different States, so long as the marriage relation continues."[56] Second, as in *Perrine*, it asserted "that a suit for divorce in itself involves no pecuniary value."[57] The Court then explained, however, that the general rule does not apply in the territories, where the federal government operates in the place of a state government.[58]

*Perrine*, *Simms*, and *De La Rama* each offered rationales for the exception that differed from Justice Daniel's *Barber* dissent, which had claimed that federal courts in equity could not hear cases that in England fell within the exclusive "cognizance of the ecclesiastical court."[59] As Mark Poker observed, moreover, the justifications offered in these three cases "appear to be only technical obstacles which can," at least in theory, "be satisfied in certain cases."[60] After all, a case involving domestic relations might conceivably involve large sums of money. Additionally, federal-question jurisdiction is no longer subject to an amount-in-controversy requirement.[61] Finally, if the domestic-relations exception is really rooted in the amount-in-controversy requirement, what makes family-law disputes in particular different from any other category of cases? Likewise, if the domestic-relations exception is truly about an inability to establish diversity of citizenship, what distinguishes family-law disputes in particular from other cases in which diversity of citizenship is lacking? Besides, the notion that spouses cannot be citizens of different states is rooted in the old doctrine that upon marriage, a woman's

---

**53.** *Id.* at 168.

**54.** *Id.* at 167-68 ("In the Territories of the United States, Congress has the entire dominion and sovereignty, national and local, Federal and state, and has full legislative power over all subjects upon which the legislature of a State might legislate within the State . . . . By the territorial statutes of Arizona, the original jurisdiction of suits for divorce is vested in the district courts of the Territory . . . .").

**55.** 201 U.S. 303, 308 (1906).

**56.** *Id.* at 307.

**57.** *Id.*

**58.** *Id.* at 308.

**59.** Barber v. Barber *ex rel.* Cronkhite, 62 (21 How.) U.S. 582, 604 (1858) (Daniel, J., dissenting).

**60.** Poker, *supra* note 21, at 145 n.30.

**61.** *See* 28 U.S.C. § 1331 (2012).

legal identity was subsumed into her husband's.[62] Today, we no longer treat marriage as extinguishing a woman's separate legal existence,[63] and so it is possible for spouses to be citizens of different states. Conspicuously, the Court has not relied on any of these rationales in recent times.

In 1930, in *Ohio ex rel. Popovici v. Agler*,[64] the Court returned to Justice Daniel's rationale for the domestic-relations exception: federal courts sitting in equity lack jurisdiction over cases that were heard in the English ecclesiastical courts.[65] Popovici was a foreign diplomat stationed and residing in Cleveland, Ohio.[66] When his wife sued him for divorce in state court, Popovici invoked Article III, which gives the Supreme Court original jurisdiction over "all Cases affecting Ambassadors, other public Ministers and Consuls,"[67] to argue that the state court lacked jurisdiction.[68] The Court reiterated that notwithstanding Article III's "sweeping" language,[69] federal jurisdiction did not extend to disputes over "divorces and alimony."[70] Such cases, the Court said, "had belonged to the ecclesiastical Courts."[71]

The Court did not address the domestic-relations exception again for more than half a century until 1992, when it decided *Ankenbrandt v. Richards*.[72] *Ankenbrandt* eschewed all prior rationales for the doctrine and offered a completely new one instead. In *Ankenbrandt*, which arose under diversity jurisdiction, the Court raised doubts about the doctrine's historical pedigree,

---

**62.** *See* 1 WILLIAM BLACKSTONE, COMMENTARIES *442 ("[B]y marriage, the husband and wife become one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated or consolidated into that of the husband, under whose wing and protection she performs everything."); 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 129 (New York, O. Halsted 2d ed. 1832) ("The legal effects of marriage are generally deducible from the principle of the common law, by which the husband and wife are regarded as one person, and her legal existence and authority in a degree lost and suspended during the existence of the matrimonial union.").

**63.** *See, e.g.*, Married Women's Property Act, ch. 200, § 3, 1848 N.Y. Laws 307, 308 ("It shall be lawful for any married female to receive, by gift, grant devise or bequest, from any person other than her husband and hold to her sole and separate use, as if she were a single female, real and personal property, and the rents, issues and profits thereof, and the same shall not be subject to the disposal of her husband, nor be liable for his debts.").

**64.** 280 U.S. 379 (1930).

**65.** *See id.* at 383-84.

**66.** *Id.* at 382.

**67.** U.S. CONST. art. III, § 2, cl. 2.

**68.** *Popovici*, 280 U.S. at 382.

**69.** *Id.* at 383.

**70.** *Id.*

**71.** *Id.* at 384.

**72.** 504 U.S. 689 (1992).

but it declined to weigh in on whether the English ecclesiastical courts had exclusive jurisdiction over domestic relations.[73] Shifting instead to statutory bases for the exception, the Court held that Congress had ratified the Court's longstanding construction of the federal-jurisdiction statutes as excluding domestic-relations matters when it revised and reenacted them in 1948.[74] Although the 1948 revision replaced the phrase "all suits of a civil nature at common law or in equity"[75] with "all civil actions,"[76] *Ankenbrandt* asserted that Congress intended "no changes of law or policy . . . from [these] changes of language."[77] It concluded that the exception reaches "only cases involving the issuance of a divorce, alimony, or child custody decree."[78]

The Supreme Court "raise[d] new questions"[79] about the exception's breadth in *Elk Grove Unified School District v. Newdow*,[80] which dismissed a First Amendment challenge to the pledge of allegiance on domestic relations-like grounds.[81] Michael Newdow sued his daughter's school district on her behalf as "next friend" and on his own. He sought a declaration that a 1954 statute adding the words "under God" to the Pledge of Allegiance[82] violated the

---

73.  *Id.* at 699.

74.  *Id.* at 699-700.

75.  Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 78.

76.  Judicial Code and Judiciary Act, ch. 646, § 1332(a), 62 Stat. 869, 930 (1948) (codified as amended at 28 U.S.C. § 1332(a) (2012)); *see also Ankenbrandt*, 504 U.S. at 698 ("The defining phrase, 'all suits of a civil nature at common law or in equity,' remained a key element of statutory provisions demarcating the terms of diversity jurisdiction until 1948, when Congress amended the diversity jurisdiction provision to eliminate this phrase and replace in its stead the term 'all civil actions.'").

77.  504 U.S. at 700 (quoting Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 227 n.8 (1957)); *see also* Finley v. United States, 490 U.S. 545, 554 (1989) (presuming no intent to change the status quo in the 1948 recodification of the Judicial Code), *superseded by statute*, Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089 (codified at 28 U.S.C. § 1367), *as recognized in* Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 558 (2005); Anderson v. Pac. Coast S.S. Co., 225 U.S. 187, 199 (1912) ("[I]t will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect, unless such intention is clearly expressed.").

78.  *Ankenbrandt*, 504 U.S. at 704.

79.  Harbach, *supra* note 7, at 154.

80.  542 U.S. 1 (2004).

81.  *Id.* at 17.

82.  Act of June 14, 1954, Pub. L. No. 83-396, § 7, 68 Stat. 249, 249 (codified as amended at 4 U.S.C. § 4 (2012)).

Free Exercise Clause[83] as well as an injunction to stop the school from requiring students to recite the Pledge of Allegiance.[84]

Under state law, Newdow lacked the right to sue on his daughter's behalf as her next friend.[85] The Court concluded that Newdow lacked prudential standing to sue because "disputed family law rights are entwined inextricably with the threshold standing inquiry,"[86] stressing that "[w]hen hard questions of domestic relations are sure to affect the outcome, the prudent course is for the federal court to stay its hand rather than reach out to resolve a weighty question of federal constitutional law."[87] The Court observed that it "has customarily declined to intervene [in] the realm of domestic relations,"[88] invoking *In re Burrus*'s claim that it "belongs to the laws of the States and not to the laws of the United States."[89] It then suggested that as a default rule, federal courts generally should not hear cases involving domestic-relations matters: "[W]hile rare instances arise in which it is necessary to answer a substantial federal question that transcends or exists apart from the family law issue, in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts."[90]

The Court's language insinuated that the domestic-relations exception may apply even in suits seeking to vindicate constitutional rights. In *Newdow*'s wake, it is uncertain how far the exception reaches or whether it applies to federal questions. *Newdow* stands in tension with *Ankenbrandt*, which held that the exception only "divests the federal courts of power to issue divorce, alimony, and child custody decrees."[91] *Newdow* asserted that federal courts should adjudicate cases involving "delicate issues of domestic relations" only in "rare instances," regardless of whether they raise federal questions; otherwise they should be left to the state courts.[92] Two years after *Newdow*, in *Marshall v. Marshall*,[93] the Court noted that *Ankenbrandt* had "reined in"[94] the domestic-

---

**83.** U.S. CONST. amend. I.

**84.** *Newdow*, 542 U.S. at 8.

**85.** *Id.* at 10.

**86.** *Id.* at 13 n.5.

**87.** *Id.* at 17.

**88.** *Id.* at 12.

**89.** *Id.* (quoting *In re* Burrus, 136 U.S. 586, 593-94 (1890)).

**90.** *Id.* at 13 (citations omitted).

**91.** Ankenbrandt v. Richards, 504 U.S. 689, 703 (1992).

**92.** 542 U.S. at 13.

**93.** 547 U.S. 293 (2006).

**94.** *Id.* at 299 ("In *Ankenbrandt* . . . this Court reined in the 'domestic relations exception.'" (citation omitted)).

relations exception without casting any doubt on that decision. However, *Marshall* also did not purport to modify *Newdow* in any way. Whether the exception reaches federal questions thus remains an unresolved question.

*Newdow*'s reasoning has been criticized by commentators as "obscure,"[95] "opaque and sometimes contradictory,"[96] "unnecessarily convoluted,"[97] and "difficult to fit . . . in the framework of traditional standing analysis."[98] Although some have speculated that "the Court dismissed *Newdow* on standing grounds to avoid a highly controversial political issue,"[99] its reasoning "seems to apply the domestic relations exception to federal questions and create a new default rule deferring to state courts on *all* domestic relations issues."[100] By suggesting that the exception could apply even in cases alleging violations of individual rights under the Constitution, *Newdow* paved the way for claims that federal courts lack jurisdiction to determine whether the Fourteenth Amendment requires states to grant same-sex marriage licenses. Indeed, after *Newdow*, scholars speculated that the exception "has the potential to be especially powerful—and perhaps dispositive—in marriage equality cases."[101] Though *Obergefell* ultimately did not acknowledge the domestic-relations exception, *Newdow* remains good law, and its expansive rhetoric is available to any future litigant who wishes to "argue . . . that federal question jurisdiction is inappropriate in cases that involve 'elements of the domestic relationship,' even on constitutional claims."[102]

---

95. 13A WRIGHT ET AL., *supra* note 1, § 3531.9.1.

96. *The Supreme Court, 2003 Term—Leading Cases*, 118 HARV. L. REV. 248, 432 (2004).

97. *Id.* at 426.

98. ERWIN CHEMERINSKY, FEDERAL JURISDICTION 89 (5th ed. 2007).

99. *Id.*

100. Harbach, *supra* note 7, at 157-58.

101. *Id.* at 158; *see also* Dale Carpenter, *Four Arguments Against a Marriage Amendment That Even an Opponent of Gay Marriage Should Accept*, 2 U. ST. THOMAS L.J. 71, 84 n.58 (2004) (describing *Newdow*'s rhetoric as "tailor-made for a future case involving a gay marriage claim"); Mary Anne Case, *Marriage Licenses*, 89 MINN. L. REV. 1758, 1791 (2005) (noting that *Newdow* was decided at a time when Congress was weighing whether to prohibit same-sex marriage via constitutional amendment or rescind federal jurisdiction over the issue, and stating that "[t]here is every indication that the current Supreme Court [is reluctant] to decide the constitutional question of who may marry"); Cass R. Sunstein, *The Right To Marry*, 26 CARDOZO L. REV. 2081, 2114 (2005) (describing *Newdow* as "fresh support" for the idea that the Court should not adjudicate the same-sex marriage issue at the present moment).

102. LINDA J. SILBERMAN ET AL., CIVIL PROCEDURE: THEORY AND PRACTICE 328 (2d ed. 2006); *see also* Lori A. Catalano, Comment, *Totalitarianism in Public Schools: Enforcing a Religious and Political Orthodoxy*, 34 CAP. U. L. REV. 601, 635 (2006) ("The majority in [*Newdow*]

### B. Confusion Across and Within the Circuits

*Obergefell* was far from the first federal-question case to rule on an issue that touched on domestic relations without acknowledging the domestic-relations exception.[103] Lower federal courts have been inconsistent in their treatment of the exception in the federal-question context: courts will adjudicate the merits of some cases without acknowledging the exception while asserting the exception to dismiss other cases. While some courts characterize the exception as a mandatory jurisdictional bar, others treat it as a prudential abstention doctrine.[104] Today, although federal courts apply the domestic-relations exception across a variety of legal and factual circumstances, there is

overextended this exception to include all cases *involving* 'delicate issues of domestic relations.'" (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 13 (2004))).

103.  *See infra* Section III.B.

104.  *See, e.g.*, Mitchell-Angel v. Cronin, No. 95-7937, 1996 WL 107300, at *2 (2d Cir. Mar. 8, 1996) ("[F]ederal courts have discretion to abstain from exercising jurisdiction over" domestic-relations issues "as long as full and fair adjudication is available in state courts."); Am. Airlines v. Block, 905 F.2d 12, 14 (2d Cir. 1990) (finding that federal courts may abstain from hearing federal-question claims that are "'on the verge' of being matrimonial . . . so long as there is no obstacle to their full and fair determination in state courts"); Hemon v. Office of Pub. Guardian, 878 F.2d 13, 14 (1st Cir. 1989) ("[F]ederal habeas corpus jurisdiction does not extend to state court disputes over child custody."); Coats v. Woods, 819 F.2d 236, 237 (9th Cir. 1987) ("Given the state courts' strong interest in domestic relations, we do not consider that the district court abused its discretion when it invoked the doctrine of abstention."); Lynk v. LaPorte Superior Court No. 2, 789 F.2d 554, 563 (7th Cir. 1986) ("The judge-made doctrine that prevents federal courts from adjudicating certain types of domestic relations case[s] under the diversity jurisdiction can be restated as a doctrine of abstention also applicable to cases brought in federal court under the federal-question jurisdiction."); Peterson v. Babbitt, 708 F.2d 465, 466 (9th Cir. 1983) (noting that "[t]he strong state interest in domestic relations matters" was one factor that led the court to conclude that "federal abstention in these cases [is] appropriate"); Csibi v. Fustos, 670 F.2d 134, 137 (9th Cir. 1982) (asserting that "[f]ederal courts may exercise their discretion to abstain from deciding" cases "where domestic relations problems are involved tangentially to other issues determinative of the case"); Tree Top v. Smith, 577 F.2d 519, 521 (9th Cir. 1978) ("[W]e would abstain from exercising federal jurisdiction unless we were presented with unique circumstances which overcame the long-standing policy of the federal courts to refrain from interfering in state domestic relations disputes."); Magaziner v. Montemuro, 468 F.2d 782, 787 (3d Cir. 1972) (finding that domestic-relations cases warranted application of the abstention doctrine); Lomtevas v. Cardozo, No. 05-CV-2779, 2006 WL 229908, at *3 (E.D.N.Y. Jan. 31, 2006) (construing the exception as an abstention doctrine); Smith v. Pension Plan of Bethlehem Steel Corp., 715 F. Supp. 715, 718 (W.D. Pa. 1989) ("[W]e hold that the domestic relations exception is one of several factors to be considered in determining whether to abstain from a federal question matter which implicates domestic relations issues."); *see also* Stein, *supra* note 20, at 670 ("Commentators, in turn, disagree not only about the merits of continuing to recognize such an exception, but also as to whether the exception is a jurisdictional or a jurisprudential bar to hearing cases.").

little consensus at the circuit level about whether or when it applies to federal-question jurisdiction.[105] To say that a circuit split exists, however, would paint too orderly a scene; several circuits have been internally inconsistent in how they approach the issue.

There are at least four sources of confusion about the exception's scope within the lower federal courts: (1) intracircuit splits, (2) district courts that do not follow circuit opinions, (3) circuit courts that use standards that are too vague to provide guidance, and (4) circuit court panels that identify different relevant factors for analysis. This Section describes each type of confusion.

Consider, for example, the Second Circuit. In *Williams v. Lambert*,[106] decided in 1995, the plaintiff sought a declaratory judgment that a New York statute prohibiting the modification of a support agreement for an illegitimate child deprived illegitimate children and their parents of equal protection under the law.[107] The Second Circuit held that the district court erred in abstaining from hearing the case because the domestic-relations exception applies only to diversity jurisdiction.[108] The very next year, however, in *Mitchell-Angel v. Cronin*, the Second Circuit applied the exception in a federal-question case. In *Mitchell-Angel*, a mother sued various defendants, alleging that they "conspired to deprive her of custody and visitation rights with her children" in violation of the First, Fifth, and Fourteenth Amendments.[109] The district court dismissed her complaint pursuant to the domestic-relations exception, and the Second Circuit affirmed, stating that the exception applies to federal questions.[110] Though *Mitchell-Angel* cited *Williams*,[111] it did not acknowledge that its holding on the exception's scope conflicted with the earlier case, much less offer a reasoned explanation for this departure.

Likewise, consider the Third Circuit's inconsistency. In *Magaziner v. Montemuro*,[112] decided in 1972, the children of parties to a state court custody dispute had retained a lawyer, who entered her appearance on the children's

---

**105.** Harbach, *supra* note 7, at 141 ("Some lower federal courts applied the exception expansively to exclude a broad variety of domestic relations issues from federal review, while other lower courts construed the doctrine narrowly to bar only divorce, custody, and alimony decrees.").

**106.** 46 F.3d 1275 (2d Cir. 1995).

**107.** *Id.* at 1278.

**108.** *Id.* at 1284 ("This case . . . is before this Court on federal question jurisdiction, not diversity. Therefore, the matrimonial exception does not apply.").

**109.** *Mitchell-Angel*, 1996 WL 107300, at *1.

**110.** *Id.* at *2 ("Mitchell argues that the district court erred in dismissing her amended complaint pursuant to the domestic-relations exception to federal jurisdiction. We disagree. . . . [T]his exception also has been applied to federal question jurisdiction.").

**111.** *Id.*

**112.** 468 F.2d 782 (3d Cir. 1972).

behalf, but the state-court judge quashed the appearance.[113] The children sued the state judge under 42 U.S.C. § 1981 and 42 U.S.C. § 1983, claiming a deprivation of their constitutional rights.[114] Relying on the exception, as elaborated in *In re Burrus*, the Third Circuit held that the district court had properly dismissed the case in part on the ground that the matter was "a domestic relations case involving a child."[115] It characterized the exception as a discretionary abstention doctrine properly invoked when a case raises "significant state concerns" without any "corresponding federal concerns."[116] Seventeen years later, it heard *McLaughlin v. Pernsley*,[117] an action brought by a white couple challenging the removal of their black foster child so that he could be placed with a black family.[118] As in *Magaziner*, the plaintiffs sued under § 1983, as well as § 1985(3).[119] This time, the Third Circuit found that it had jurisdiction over the case, holding that the domestic-relations exception did not apply to federal-question cases.[120] It did not acknowledge or explain its contrary holding in *Magaziner*.

---

113. *Id.* at 783.

114. *Id.*

115. *Id.* at 787 (citing Albanese v. Richter, 161 F.2d 688 (3d Cir. 1947)).

116. *Id.*

117. 876 F.2d 308 (3d Cir. 1989).

118. *See id.* at 309-10.

119. *Id.* at 310.

120. *Id.* at 312-13.

Intracircuit splits—directly contrary statements about whether the exception may preclude federal-question jurisdiction—exist in at least the Second,[121] Third,[122] Sixth,[123] Seventh,[124] Eighth,[125] and Ninth[126] Circuits. One

---

121. *Compare* Williams v. Lambert, 46 F.3d 1275, 1283 (2d Cir. 1995) (stating that "the general policy that federal courts should abstain from deciding cases that involve matrimonial and domestic relations issues is not applicable here [in federal-question cases]"), *and* Hernstadt v. Hernstadt, 373 F.2d 316, 317-18 (2d Cir. 1967) ("When a pure question of constitutional law is presented, this Court has suggested that the District Court may assume jurisdiction even if the question arises out of a domestic relations dispute . . . ."), *with* Mitchell-Angel v. Cronin, No. 95-7937, 1996 WL 107300, at *2 (2d Cir. Mar. 8, 1996) (indicating that the exception applies in federal-question cases). *See also* Ashmore v. Prus, 510 F. App'x 47, 49 (2d Cir. 2013) ("We expressly decline to address whether the domestic relations exception to federal subject matter jurisdiction applies to federal question actions."); Ashmore v. New York, No. 12-CV-3032(JG), 2012 WL 2377403, at *2 (E.D.N.Y. June 25, 2012) (finding a constitutional claim "barred by the domestic relations exception to this court's jurisdiction"), *aff'd on other grounds sub nom.*, *Prus*, 510 F. App'x 47; Puletti v. Patel, No. 05 CV 2293(SJ), 2006 WL 2010809, at *4 (E.D.N.Y. July 14, 2006) (applying the exception in a federal-question case); Chase v. Czajka, No. 04 Civ. 8228, 2005 U.S. Dist. LEXIS 8743, at *19-23 (S.D.N.Y. May 12, 2005) (same); McArthur v. Bell, 788 F. Supp. 706, 708-09 (E.D.N.Y. 1992) (same).

122. *Compare* McLaughlin v. Pernsley, 876 F.2d 308, 312 (3d Cir. 1989) ("We recognize that domestic relations matters have traditionally been viewed as a limitation on the diversity jurisdiction of the federal courts. . . . But this action was not brought under the diversity statute."), *and* Flood v. Braaten, 727 F.2d 303, 308 (3d Cir. 1984) ("[T]he domestic relations exception does not apply to cases arising under the Constitution or laws of the United States."), *with* Magaziner v. Montemuro, 468 F.2d 782 (3d Cir. 1972) (declining to exercise jurisdiction over a federal civil rights claim). For district-court opinions within the Third Circuit, see *Birla v. Birla*, No. 07-1774 (MLC), 2007 WL 3227185, at *2 (D.N.J. Oct. 30, 2007), which applies the exception in a federal-question case; and *Dixon v. Kuhn*, No. 06-4224 (MLC), 2007 WL 128894, at *2 (D.N.J. Jan. 12, 2007), which also applies the exception.

123. *Compare* Catz v. Chalker, 142 F.3d 279, 291-92 (6th Cir. 1998) (holding that the exception applies to federal questions only in "core" domestic-relations cases), Agg v. Flanagan, 855 F.2d 336, 339 (6th Cir. 1988) ("The claim that the state's method of determining and enforcing child support is unconstitutional and contrary to federal law is not identical to a claim that a particular support order is too high. The domestic relations exception . . . [does not apply to] the first."), Huff v. Metro. Life Ins. Co., 675 F.2d 119, 122-23 (6th Cir. 1982) (stating that a federal court has jurisdiction to decide whether benefits that depended on domestic-relations issues existed under a federal statute), *and* Huynh Thi Anh v. Levi, 586 F.2d 625, 627 (6th Cir. 1978) (declining to apply the exception to a habeas petition), *with* Firestone v. Cleveland Tr. Co., 654 F.2d 1212, 1215 (6th Cir. 1981) ("Even when brought under the guise of a federal question action, a suit whose substance is domestic relations generally will not be entertained in a federal court."). For a district-court case within the Sixth Circuit, see *Smith v. Oakland County Circuit Court*, 344 F. Supp. 2d 1030, 1064-66 (E.D. Mich. 2004), which applies the exception in a federal-question case.

124. *Compare* Jones v. Brennan, 465 F.3d 304, 307 (7th Cir. 2006) (suggesting that the exception should apply to federal questions), *and* Allen v. Allen, 48 F.3d 259, 261 (7th Cir. 1995) (holding that "[t]he domestic relations exception to federal jurisdiction prevents the district court from hearing" a constitutional claim that is "inextricably intertwined" with a challenge

panel will hold either that the exception does or does not apply in federal-question cases, only for a later panel of the same circuit to rule the opposite way, without acknowledging the resulting inconsistency. Similarly, while the Tenth Circuit has declined to apply the exception in federal-question cases,[127] scattered district courts within it have nonetheless ruled otherwise.[128]

to an underlying custody decree), *with* Lynk v. LaPorte Superior Court No. 2, 789 F.2d 554, 558 (7th Cir. 1986) (exercising jurisdiction over a case involving family matters because it did not arise pursuant to diversity jurisdiction).

125. *Compare* Ruffalo *ex rel.* Ruffalo v. Civiletti, 702 F.2d 710, 718 (8th Cir. 1983) (implying that the exception is not a jurisdictional bar by declining to apply it in a federal-question suit because there was no "state forum in which the plaintiff may obtain relief"), *and* Overman v. United States, 563 F.2d 1287, 1292 (8th Cir. 1977) ("There is, and ought to be, a continuing federal policy to avoid handling domestic relations cases in federal court in the absence of important concerns of a constitutional dimension."), *with* Smith v. Huckabee, 154 F. App'x 552, 554-55 (8th Cir. 2005) (declining to hear a § 1983 case because it raised domestic relations issues), *and* Bergstrom v. Bergstrom, 623 F.2d 517, 520 (8th Cir. 1980) ("Where a constitutional issue arises out of a custody dispute, and the initial determination involves a reexamination of the custody arrangement, the proper course is to dismiss the case and remand to the state court."). *Ruffalo* purported not to decide whether the domestic-relations exception applies to federal questions because "[h]ere, the state court cannot grant effective relief." 702 F.2d at 718. It logically follows from this reasoning, however, that the exception cannot be a general limitation on federal-question jurisdiction. For district-court cases within the Eighth Circuit, see *Whiteside v. Nebraska State Health & Human Services*, No. 4:07CV3030, 2007 WL 2123754, at *1-2 (D. Neb. July 19, 2007), which applies the exception in a federal-question case; and *Harden v. Harden*, No. 8:07cv68, 2007 WL 700982, at *2 (D. Neb. Feb. 28, 2007), which also applies the exception.

126. *Compare* Atwood v. Fort Peck Tribal Court Assiniboine, 513 F.3d 943, 947 (9th Cir. 2008) ("[T]he domestic relations exception applies only to the diversity jurisdiction statute . . . ."), *with* Tree Top v. Smith, 577 F.2d 519, 520 (9th Cir. 1978) (declining to exercise jurisdiction over a habeas petition). For district-court cases within the Ninth Circuit that apply the exception in a federal-question case, see *Edland v. Edland*, No. C08-5222RBL, 2008 WL 2001813, at *1 (W.D. Wash. May 7, 2008); *Arroyo ex rel. Arroyo-Garcia v. County of Fresno*, No. CV F 07-1443 AWI SMS, 2008 WL 540653, at *4 (E.D. Cal. Feb. 25, 2008); *Andrews v. Jefferson County Colorado Department of Human Services*, No. C07-02918 HRL, 2007 WL 3035447, at *2 (N.D. Cal. Oct. 16, 2007); *Fisher v. California*, No. 1:06-CV-00363-AWI-DLB-P, 2007 WL 1430091, at *1 (E.D. Cal. May 15, 2007); *Banks v. Washington CPS*, No. CV-06-0335-JLQ, 2007 U.S. Dist. LEXIS 103043, at *2 (E.D. Wash. Jan. 11, 2007); *Gates v. County of Lake*, No. CIV. S-05-1374 DFL PAN PS, 2005 U.S. Dist. LEXIS 32182, at *2 (E.D. Cal. Dec. 12, 2005); and *Rousay v. Mieseler*, No. CIV. S-05-1261 LKK PAN PS, 2005 U.S. Dist. LEXIS 27431, at *3 (E.D. Cal. Nov. 9, 2005).

127. *See, e.g.*, Johnson v. Rodrigues, 226 F.3d 1103, 1111-12 (10th Cir. 2000) (denying that the exception prevents federal courts from adjudicating constitutional questions since remaining state-law questions can be remanded to state courts).

128. *See, e.g.*, Wideman v. Colorado, No. 06-cv-001423-WDM-CBS, 2007 WL 757639, at *7 (D. Colo. Mar. 8, 2007) (finding a lack of subject-matter jurisdiction over a constitutional claim pursuant to the domestic-relations exception); Fellows v. Kansas, No. 04-4131-JAR, 2005 WL 752129, at *4 (D. Kan. Mar. 31, 2005) (holding that the court "cannot decide" the

Conflicting or confusing precedents provide little guidance for litigants or district-court judges.

Intracircuit confusion falling short of an intracircuit split has also contributed to confusion over the exception's scope. For instance, different panels of the Sixth Circuit have issued opinions that purport to cohere with one another, but do so by employing standards too vague to offer helpful guidance to litigants or district-court judges. The result is that panels seem to decide whether to apply the exception to the particular federal questions before them on an essentially ad hoc basis.

In *Denman v. Leedy*,[129] a plaintiff, who was estranged from his wife, sued various defendants, including public officials and members of his family, under § 1983 and § 1985(3) for "conspir[ing] to 'deprive [him] of their mutual care, companionship, love and affection.'"[130] Although the case involved federal questions, the Sixth Circuit affirmed the district court's decision to dismiss. Citing the domestic-relations exception, the Sixth Circuit held: "[I]t is readily apparent that the substance of this claim is an intrafamily custody battle. As such this court has no jurisdiction to entertain the present suit."[131] A later case, *Firestone v. Cleveland Trust Co.*, dismissed a diversity action on domestic-relations grounds, asserting in dicta that "[e]ven when brought under the guise of a federal question action, a suit whose substance is domestic relations generally will not be entertained in a federal court," citing *Denman*.[132] It gave no guidance on how to tell when purported federal-question suits are "substantively" domestic-relations suits.

In *Catz v. Chalker*,[133] the plaintiff and defendant were former spouses. Robert Catz obtained a divorce decree from an Ohio court in 1989, and the couple later moved to Arizona, where in 1994, Susan Chalker obtained a divorce decree of her own.[134] Catz brought a collateral attack against the Arizona decree in federal court, but district courts in Tennessee and Ohio dismissed.[135] *Catz* acknowledged *Firestone* and admitted that the domestic-

---

plaintiff's federal-question claims due to the domestic-relations exception); Pettit v. New Mexico, 375 F. Supp. 2d 1140, 1151 (D.N.M. 2004) ("[T]he domestic relations exception precludes the Court from exerting jurisdiction over some, if not all, of Pettit's [federal-question] claims.").

**129.** 479 F.2d 1097 (6th Cir. 1973).

**130.** *Id.* at 1098.

**131.** *Id.*

**132.** 654 F.2d 1212, 1215 (6th Cir. 1981).

**133.** 142 F.3d 279 (6th Cir. 1998).

**134.** *Id.* at 281.

**135.** *Id.* at 283-84, 289-90.

relations exception "is not the most coherent of doctrines."[136] However, it held that the exception applies only to a "'*core*' domestic relations case," such as one "seeking a declaration of marital or parental status," and not to "a constitutional claim in which it is incidental that the underlying dispute involves" domestic relations.[137] *Catz* did not provide determinative guidance for distinguishing core from noncore domestic-relations cases. Instead, it supplied a list of paradigmatic core case scenarios, including cases involving "the merits of a divorce action," a "custody determination [of what] would be in the best interest of a child," and a determination of "an equitable division of property."[138] Because Catz sought a determination only of "whether certain judicial proceedings, which happened to involve a divorce, comported with the federal constitutional guarantee of due process,"[139] the Sixth Circuit concluded that his suit was a noncore case and that the court had jurisdiction.[140] In *Catz's* wake, it seems that the Sixth Circuit will hear genuine federal questions that merely happen to touch upon domestic-relations matters or noncore domestic-relations cases. But the court will not consider core domestic-relations cases or domestic-relations claims brought in the guise of a federal question.

Intracircuit confusion also arises when panels identify different factors as relevant to whether courts should hear federal questions involving domestic-relations issues, thus failing to establish consistent rules for when the exception applies. For example, in deciding a habeas petition in *Fernos-Lopez v. Figarella Lopez*, the First Circuit observed that some courts have applied the exception to federal-question disputes, but "only when the federal court would become deeply involve[d] in adjudicating domestic matters, or enmeshed in factual disputes."[141] It found no bar in that case, where the federal issue was "a procedural claim having scant connection to the substance of the underlying alimony dispute."[142] In contrast, in *Hemon v. Office of Public Guardian*, the First Circuit held that the exception precluded federal review of the habeas petition at issue, but rested its decision on the "policy" of "abstaining from asserting federal subject matter jurisdiction over domestic relations matters."[143] This language suggests that the court of appeals might have ruled the other way had policy or prudential considerations so counseled. While *Fernos-Lopez*

---

**136.** *Id.* at 290.

**137.** *Id.* at 291 (emphasis added).

**138.** *Id.* at 291-92.

**139.** *Id.* at 292.

**140.** *Id.* at 291 (concluding "that the case is best described as" a noncore case).

**141.** 929 F.2d 20, 22 (1st Cir. 1991) (alteration in original) (citations omitted).

**142.** *Id.* at 23.

**143.** 878 F.2d 13, 15 (1st Cir. 1989).

emphasized the fact/law and substance/procedure divides as crucial to the exception's applicability in particular cases, *Hemon* weighed federalism and finality concerns against the federal interest in resolving the dispute.[144]

Overall, the various federal courts' treatment of the exception's scope can, to quote one commentator, "most charitably be described as chaotic."[145] Yet it is unlikely that the Supreme Court will step in anytime soon to resolve this issue. One of the considerations that govern the Supreme Court's decisions to grant or deny certiorari is whether there exists a circuit split on the issue.[146] Because the lower courts' divergent perspectives on the exception's scope do not cleave neatly across circuit lines to create a tidy circuit split, the likelihood that the Supreme Court will grant certiorari is accordingly diminished. It is ironic that so much confusion—confusion that goes well beyond a circuit split—may help elude Supreme Court review, when one of the goals of certiorari is to ensure uniformity of federal law across the judiciary. In any event, the Court has shown that it is not eager to resolve this issue, as it declined to do so in *Obergefell*. This is unfortunate, as it leads lower federal courts to dismiss federal-question cases that they are duty-bound to resolve.

## II. THE CASE FOR APPLYING THE EXCEPTION TO FEDERAL QUESTIONS

Why is there so much confusion in the courts over whether the domestic-relations exception applies to federal questions? There are three primary arguments as to why it does. The first is an originalist argument about the meaning of the terms law and equity in Article III, as well as the federal question jurisdiction statute. The second argument sounds in federalism; it asserts that as a matter of constitutional structure and as a prudential matter, the exception serves values that lie at the heart of our system of dual sovereignty. The final argument sounds in doctrine: many of the early domestic-relations cases in fact arose under federal-question jurisdiction, undermining the claim that the exception is a limit only on federal diversity jurisdiction.

---

144. *See id.* at 14-15.

145. Stein, *supra* note 20, at 679.

146. SUP. CT. R. 10(a).

A. *The Originalist Argument*

First, consider the originalist argument for applying the exception to federal questions. This argument construes Article III and the federal-jurisdiction statutes to withhold domestic-relations jurisdiction from the federal courts. It contends that the original public meaning of the terms "law" and "equity" in these documents, at the moments of ratification and enactment, respectively, reflected English law and equity jurisdiction, which did not include domestic-relations cases, then understood to be the exclusive province of English ecclesiastical jurisdiction. This Section rehearses the constitutional and statutory arguments in turn.

Article III provides, "The judicial Power shall extend to all Cases, *in Law and Equity*, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."[147] At the time the Constitution was enacted, some assert, the phrase "Cases, in Law and Equity" was understood to be a "term of art . . . which did not include marriage-related issues."[148] The phrase was understood to encompass only cases that could have been heard in the English law courts, such as the courts of king's bench or common pleas, or equity courts, such as the courts of exchequer or chancery.[149] In 1787, cases involving marital matters could not be brought in "the royal courts (both the common law courts and the Chancery court) at Westminster.[150] They could only be brought "in the Ecclesiastical Courts of the Church of England."[151] As such, the argument goes, the ratifiers of the U.S. Constitution could not have understood the Article III terms "law" and "equity" to encompass cases that fell within English ecclesiastical jurisdiction. Under this interpretation of Article III, the Constitution, reflecting

---

147. U.S. CONST. art. III, § 2 (emphasis added).

148. Eagle Forum Brief, *supra* note 12, at 4.

149. Calabresi & Sinel, *supra* note 25, (manuscript at 5).

150. Jones v. Brennan, 465 F.3d 304, 306 (7th Cir. 2006); *see also* Ohio *ex rel.* Popovici v. Agler, 280 U.S. 379, 384 (1930) (asserting that federal jurisdiction over "suits against consuls and vice-consuls" does not "include what formerly would have belonged to the ecclesiastical Courts"); Reynolds v. United States, 98 U.S. 145, 165 (1878) ("[U]pon the separation of the ecclesiastical courts from the civil[,] the ecclesiastical [courts] were supposed to be the most appropriate for the trial of matrimonial causes and offences against the rights of marriage . . . ."); Eagle Forum Brief, *supra* note 12, at 4-5 ("[C]ases at law were heard before the Court of King's Bench or the Court of Common Pleas, and cases in equity were heard before the Court of Exchequer or the Court of Chancery. In 1787, only Ecclesiastical Courts could hear marriage-related cases . . . ."); 13E WRIGHT ET AL., *supra* note 1, § 3609 ("Traditionally, the exceptions were rationalized on the basis of an historic analysis of the ecclesiastical jurisdiction of the English courts . . . .").

151. 13E WRIGHT ET AL., *supra* note 1, § 3609.

the contours of English jurisdiction, simply does not grant federal courts jurisdiction over domestic-relations cases. This would be true whether the domestic-relations case were a federal-question case or a diversity dispute.

The statutory argument for applying the exception to federal questions is similar. Proponents of applying the exception to federal questions argue that the Judiciary Act of 1789 "would not initially have been understood to encompass matrimonial causes since the English courts of law and of equity did not have jurisdiction over matrimonial causes at all until at least 1857."[152] Lower federal courts lacked statutory federal-question jurisdiction until Congress passed the Jurisdiction and Removal Act of 1875,[153] which was "directly modeled on the grant of the diversity jurisdiction in the Judiciary Act of 1789"[154] and "gave the lower federal courts jurisdiction to hear 'all suits of a civil nature at common law or in equity.'"[155] In 1875, this language would have been understood as a term of art, empowering courts to hear only "cases that could have been heard in Great Britain by the Court of King's Bench, the Court of Common Pleas, the Court of Exchequer, or the Court of Chancery in 1789."[156] Thus, even once the 1875 Act was passed, federal courts still lacked jurisdiction over domestic-relations questions.

According to *Ankenbrandt*, by 1948, Congress understood the terms "law" and "equity" in the diversity-jurisdiction statute to not encompass domestic-relations matters,[157] and did not intend to upset that construction when it updated the jurisdictional statutes that year.[158] Thus, as *Ankenbrandt* ruled,

---

**152.** Calabresi & Sinel, *supra* note 25, (manuscript at 42).

**153.** Jurisdiction and Removal Act of 1875, ch. 137, 18 Stat. 470; *see* Merrell Dow Pharm., Inc. v. Thompson, 478 U.S. 804, 807 (1986) (referring to "the Judiciary Act of 1875").

**154.** Calabresi & Sinel, *supra* note 25, (manuscript at 42).

**155.** *Id.* (manuscript at 42-43) (emphasis omitted).

**156.** *Id.* (manuscript at 43).

**157.** Ankenbrandt v. Richards, 504 U.S. 689, 700 (1992); *see also supra* Section I.A.

**158.** *Ankenbrandt*, 504 U.S. at 700-01. Courts generally do not presume that Congress has amended a statute by implication. *See* Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 662 (2007) (noting that repeals by implication are disfavored); Chem. Mfrs. Ass'n v. Nat. Res. Def. Council, Inc., 470 U.S. 116, 128 (1985) ("[A]bsent an expression of legislative will, we are reluctant to infer an intent to amend the Act so as to ignore the thrust of an important decision."); Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 134 (1974) ("A new statute will not be read as wholly or even partially amending a prior one unless there exists a 'positive repugnancy' between the provisions of the new and those of the old that cannot be reconciled." (quoting *In re* Penn Cent. Transp. Co., 384 F. Supp. 895, 943 (Reg'l Rail Reorg. Ct. 1974))); United States v. Welden, 377 U.S. 95, 103 n.12 (1964) ("Amendments by implication . . . are not favored."); United States v. Madigan, 300 U.S. 500, 506 (1937) ("[T]he modification by implication of the settled construction of an earlier and different section is not favored.").

when Congress revised the jurisdictional statutes, it intended that domestic-relations matters be excluded from the scope of federal jurisdiction.[159] Although *Ankenbrandt* was a diversity case, this reasoning applies just as well to the federal question jurisdiction statute, or so the argument goes—by 1948, the exception was understood to encompass federal-question jurisdiction, and Congress ratified that understanding when it updated the federal question jurisdiction statute.

### B. Federalism-Based Arguments

The second line of argument marshaled in support of applying the exception to federal questions is that doing so also serves important federalism values. These arguments, which tend to be phrased in constitutional or prudential (though not statutory) terms, fall into several categories. One involves the claim that applying the exception to federal questions preserves the autonomy of states to define public policy respecting the family.[160] Another

---

**159.** *Ankenbrandt*, 504 U.S. at 700 ("Whatever Article III may or may not permit, we thus accept the *Barber* dictum as a correct interpretation of the Congressional grant." (quoting Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, 490 F.2d 509, 514 (2d Cir. 1973)).

**160.** *See, e.g.*, *Ankenbrandt*, 504 U.S. at 704 (noting the "special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of [divorce, child custody and alimony] decrees"); Fernos-Lopez v. Figarella Lopez, 929 F.2d 20, 22 (1st Cir. 1991) (noting "the strong state interest in domestic relations"); Vaughan v. Smithson, 883 F.2d 63, 65 (10th Cir. 1989) ("[T]he states have a strong interest in domestic relations matters . . . ."); Drewes v. Ilnicki, 863 F.2d 469, 471 (6th Cir. 1988) ("[T]he exception . . . continues to the present day because the field of domestic relations involves local problems . . . ."); Raftery v. Scott, 756 F.2d 335, 343 (4th Cir. 1985) ("[T]he state through its courts has a stronger and more direct interest in the domestic relations of its citizens than does the federal court."); Ruffalo *ex rel.* Ruffalo v. Civiletti, 702 F.2d 710, 717 (8th Cir. 1983) ("[F]ederal courts have consistently refused to entertain diversity suits involving domestic relations [due to] the strong state interest in domestic relations matters . . . ."); Csibi v. Fustos, 670 F.2d 134, 136-37 (9th Cir. 1982) ("States have an interest in family relations superior to that of the federal government . . . ."); Ellison v. Sadur, 700 F. Supp. 54, 55 (D.D.C. 1988) ("This exception is largely grounded in the belief that state courts have a particularly strong interest . . . in resolving disputes involving family relationships."); Tuerffs v. Tuerffs, 117 F.R.D. 674, 675 (D. Colo. 1987) (observing the "state's strong interest in domestic relations cases"); Yelverton v. Yelverton, 614 F. Supp. 528, 529 (N.D. Ind. 1985) ("[D]omestic relations matters, being of local concern, are best left to the jurisdictional province of state courts."); *see also* Kirby v. Mellenger, 830 F.2d 176, 178 (11th Cir. 1987) ("The reasons for federal abstention in these cases are apparent: the strong state interest in domestic relations matters, the competence of state courts in settling family disputes, the possibility of incompatible federal and state court decrees in cases of continuing judicial supervision by the state, and the problem of congested dockets in federal courts."); Crouch v. Crouch, 566 F.2d 486, 487 (5th Cir. 1978) (same); Rush, *supra* note 22, at 8-9 ("Reasons for this abstention include the [superior] competence and expertise of state courts in settling

asserts that the adjudication of family law-issues is best left to state courts, which have greater expertise and competence to adjudicate such cases than do federal courts.[161] A third holds that giving state courts exclusive jurisdiction over domestic-relations cases discourages forum shopping. The final argument is that an expansive domestic-relations exception promotes parity between state and federal courts.

One prudential reason to apply the exception to federal questions is that family law is a core area of state concern. Prohibiting federal courts from intruding into family law gives states flexibility to adapt to different preferences and changing circumstances.[162] Crafting a workable system of family law requires calibrating a "complex level of benefits"[163] to which state law entitles those who occupy different familial roles. Decisions regarding not only whether to grant legal entitlements, such as marriage, but also the *degree* of benefits that state law will provide have normative dimensions. The Supreme Court has long regarded the regulation of domestic relations "as a

---

family disputes, the strong interests of the state in domestic relations matters, the risk of inconsistent federal and state court rulings in cases of continuing state court jurisdiction, and congested federal dockets.").

161. *See, e.g.*, *Ankenbrandt*, 504 U.S. at 703-04 ("Issuance of decrees of this type not infrequently involves retention of jurisdiction by the court and deployment of social workers to monitor compliance. As a matter of judicial economy, state courts are more eminently suited to work of this type than are federal courts, which lack the close association with state and local government organizations dedicated to handling issues that arise out of conflicts over divorce, alimony, and child custody decrees."); *Fernos-Lopez*, 929 F.2d at 22 (noting "the relative expertise of state courts"); *Vaughan*, 883 F.2d at 65 (noting that states "have developed an expertise in settling family disputes"); Rykers v. Alford, 832 F.2d 895, 899 (5th Cir. 1987) ("[T]he state courts have greater expertise and interest in domestic matters."); *Ruffalo*, 702 F.2d at 717 (observing "the competence of state courts in settling family disputes" (quoting *Crouch*, 566 F.2d at 487)); Lloyd v. Loeffler, 694 F.2d 489, 492 (7th Cir. 1982) ("At its core are certain types of cases, well illustrated by divorce, that the federal courts are not, as a matter of fact, competent tribunals to handle. . . . They are not local institutions, they do not have staffs of social workers, and there is too little commonality between family law adjudication and the normal responsibilities of federal judges to give them the experience they would need to be able to resolve domestic disputes with skill and sensitivity."); *Csibi*, 670 F.2d at 137 ("[S]tate courts have more expertise in the field of domestic relations."); McCullough *ex rel.* Jordan v. McCullough, 760 F. Supp. 613, 616 (E.D. Mich. 1991) ("[State courts] have developed a proficiency and expertise in these cases." (quoting Firestone v. Cleveland Tr. Co., 654 F.2d 1212, 1215 (6th Cir. 1981))); *Ellison*, 700 F. Supp. at 55 (asserting that state courts "have developed special competence" in family law issues); *Tuerffs*, 117 F.R.D. at 675 (noting "the competence of state courts to settle [domestic] disputes").

162. As amici in *Obergefell* put it, "[L]eaving states responsible to shape family law in light of the flux in family forms is most likely to promote sound policies responsive to the needs of American families over time." Kuykendall et al. Brief, *supra* note 12, at 12.

163. *Id.* at 15.

virtually exclusive province of the States."[164] In *United States v. Windsor*, it recognized that the "definition of marriage is the foundation of the State's broader authority [over] the subject of domestic relations."[165] By preserving state primacy over family law, the exception requires the federal government to defer to states in a subject that is at the heart of their powers. Cabining the exception to diversity cases "would interfere with the states' capacity to infuse normative structural ideals into marriage law."[166]

Applying the exception to federal questions also manifests respect for state-level democratic processes by preventing a single disgruntled litigant with access to a federal court from undoing their results.[167] Legislatures are the proper settings for policy debates over the structure of marriage because, as representative, democratic bodies, they enable citizens to participate in statewide conversations regarding the terms of the political compact by which they interact as members of a society. A state's family law emerges from the crucible of open and inclusive legislative discussion in "a statewide deliberative process that enable[s] its citizens to discuss and weigh arguments."[168] Even state *courts* have a democratic pedigree that their federal counterparts lack. While state courts may lack the representative character of state legislatures, they are bound by the rules that state legislatures lay down, which they may only disregard when state constitutions or federal law commands. Yet citizens' ability to self govern is undermined when federal courts enable disgruntled participants in state-level policy contests to relitigate debates that were settled through open and fair democratic competition.[169]

A second reason to apply the exception to federal questions is that federal courts are comparatively unprepared and ill equipped to adjudicate domestic-relations matters, over which state courts have developed a familiarity and mastery from centuries of dominant control.[170] Federalizing broad swaths of

---

**164.** Sosna v. Iowa, 419 U.S. 393, 404 (1975).

**165.** 133 S. Ct. 2675, 2691 (2013).

**166.** Kuykendall et al. Brief, *supra* note 12, at 14.

**167.** *See id.* at 16-17 (arguing that without an exception to family law cases raising federal questions, "a party failing to gain a favorable outcome in state courts or the democratic process could file in federal court").

**168.** *Windsor*, 133 S. Ct at 2689.

**169.** *Cf.* ALEXANDER M. BICKEL, THE LEAST DANGEROUS BRANCH: THE SUPREME COURT AT THE BAR OF POLITICS (1962) (discussing the threat of overly active courts to majoritarian political processes).

**170.** While federal courts rarely hear "legal subjects affected by the laws of marriage and divorce," state courts "primarily, routinely, and exhaustively" hear cases involving "[p]roperty rights and distribution, child custody and support, [and] the disposition of estates." Brief of States II, *supra* note 12, at 7.

family law might require creating a body of one-size-fits-all federal law on topics such as divorce, the best interests of the child, and who counts as a parent,[171] interfering with states' abilities to answer these questions themselves.

Then there is the problem of forum shopping, which undermines federalism values by enabling litigants to avoid the legal rules of decision that states have adopted for themselves. Creating dual bodies of state and federal family law would predictably cause litigants to "file in the jurisdiction — state or federal — most favorable to them."[172] Indeed, an advocate would be professionally irresponsible *not* to shop for the most favorable forum for her or his client. As one former trial lawyer wrote, his job involved "fighting every inch of the way to prevail for [his] client. Shopping for the best forum available was simply the first step in achieving that objective."[173] Why should we expect responsible advocates to refrain from shopping for the best fora to resolve their clients' domestic-relations matters?

Finally, bringing federal questions within the scope of the domestic-relations exception also recognizes parity between the federal and state courts with respect to constitutional issues. Henry Hart, Jr. raises the point that state courts are "the primary guarantors of constitutional rights, and in many cases . . . the ultimate ones."[174] One reason why Congress has nearly plenary power to restrict federal jurisdiction, Hart, Jr. says, is because state courts can still hear federal-question claims.[175] It is good enough, he says, that "state courts always have a general jurisdiction to fall back on," which "the Supremacy Clause binds them to exercise . . . in accordance with the Constitution."[176] Though some might say that federal judges are better equipped to resolve federal questions than state judges,[177] the Supreme Court has asserted that state courts are just as hospitable fora for the vindication of

---

**171.** Kuykendall et al. Brief, *supra* note 12, at 15 ("If the Fourteenth Amendment speaks to the rights of states to license same-sex marriage, the same logic speaks to a variety of institution-based topics within family law . . . such as divorce, the best interests of children and defining the meaning of the word 'parent.'").

**172.** *Id.* at 19.

**173.** Richard Maloy, *Forum Shopping? What's Wrong with That?*, 24 QUINNIPIAC L. REV. 25, 25 (2005).

**174.** Henry M. Hart, Jr., *The Power of Congress To Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 HARV. L. REV. 1362, 1401 (1953).

**175.** *Id.* Others also make this claim. *See, e.g.*, Martin H. Redish, *Constitutional Limitations on Congressional Power To Control Federal Jurisdiction: A Reaction to Professor Sager*, 77 NW. U. L. REV. 143 (1982).

**176.** Hart, *supra* note 174, at 1401.

**177.** *See infra* Section III.A.2.

federal rights as federal courts.[178] Perhaps the domestic-relations exception is just one reflection of a larger structural parity between state and federal courts lying at the heart of the Madisonian Compromise—the choice to "award[] Congress the option of choosing whether or not to create lower federal courts," made "[o]n the assumption that the state courts would be open to hear all federal claims."[179]

In sum, some assert that applying the domestic-relations exception to federal questions serves important federalism values that our system of dual sovereignty presupposes. Their argument is that an expansive domestic-relations exception plays an essential role in preserving the subject of family law as a realm of state prerogatives, emphasizing parity between state and federal courts, and ensuring that the federal government does not overwhelm the states but instead respects their important role in our constitutional structure.

## C. The Precedential Argument

A final argument in favor of applying the domestic-relations exception to federal questions is that despite often being characterized as a limit on diversity jurisdiction,[180] the exception was in fact established early on by cases involving

---

178. *See, e.g.*, Stone v. Powell, 428 U.S. 465, 494 n.35 (1976) ("[W]e are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States. State courts, like federal courts, have a constitutional obligation to safeguard personal liberties and to uphold federal law."); *see also* Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 HARV. L. REV. 441, 509 (1963) ("There is no intrinsic reason why the fact that a man is a federal judge should make him more competent, or conscientious, or learned with respect to the applicable federal law than his neighbor in the state courthouse.").

179. Martin H. Redish & Curtis E. Woods, *Congressional Power To Control the Jurisdiction of Lower Federal Courts: A Critical Review and a New Synthesis*, 124 U. PA. L. REV. 45, 47 & n.8 (1975).

180. *See, e.g.*, CHEMERINSKY, *supra* note 98, at 311-14; 1 BARBARA J. VAN ARSDALE ET AL., FEDERAL PROCEDURE, LAWYERS EDITION § 1:261 (2013); 13E WRIGHT ET AL., *supra* note 1, §§ 3609, 3690.1; Michael B. Mushlin, *Unsafe Havens: The Case for Constitutional Protection of Foster Children from Abuse and Neglect*, 23 HARV. C.R.-C.L. L. REV. 199, 270 (1988); Rush, *supra* note 22, at 20 ("[D]omestic relations cases that raise federal questions should be treated like other federal question cases."); Thomas H. Dobbs, Note, *The Domestic Relations Exception Is Narrowed After* Ankenbrandt v. Richards, 28 WAKE FOREST L. REV. 1137, 1137 (1993) (explaining that the exception limits federal "jurisdiction over matters of domestic relations even when litigants could establish diversity of citizenship and the amount in controversy requirements"); Moore, *supra* note 22, at 878 (arguing that in federal-question cases implicating domestic relations, "[t]he question federal courts should ask . . . is whether the parties claiming federal jurisdiction are truly alleging a nonfrivolous constitutional claim or are merely involved in a domestic relations dispute which has no reason for being in the federal courts under the federal question statute" (citation omitted)); Maryellen Murphy,

federal questions.[181] This fact tends to undermine the claim that the exception is cabined to the context of diversity jurisdiction.

Of the earliest domestic-relations exception cases, two—*In re Burrus*[182] and *Perrine*[183]—arose pursuant to federal habeas jurisdiction, while two more—*Simms*[184] and *De la Rama*[185]—arose pursuant to jurisdiction granted by federal statute over territorial courts. None of these four early cases involved conflicts between diverse parties. Another early domestic-relations case, *Popovici*,[186] came to the Supreme Court from the Ohio Supreme Court but involved federal-question jurisdiction over "all Cases affecting Ambassadors, other public Ministers and Consuls."[187] In fact, only one early domestic-relations exception case, *Barber*,[188] arose pursuant to federal diversity jurisdiction.

Later Supreme Court cases also seem to apply the exception to federal questions. *Newdow* insinuated that the domestic-relations exception applied even in cases raising "weighty question[s] of federal constitutional law."[189] Even *Baker v. Nelson*,[190] the 1972 summary disposition whose precedential value was extensively debated in the lead-up to *Obergefell*,[191] was arguably

---

Comment, *Domestic Relations Exception to Diversity Jurisdiction: Ankenbrandt v. Richards*, 28 NEW ENG. L. REV. 577, 577 (1993) (describing the exception as "a limitation on federal court diversity jurisdiction"); Swenson, *supra* note 22, at 1096; Anthony B. Ullman, Note, *The Domestic Relations Exception to Diversity Jurisdiction*, 83 COLUM. L. REV. 1824, 1824 (1983); Francis M. Dougherty, Annotation, *"Domestic Relations" Exception to Jurisdiction of Federal Courts Under Diversity of Citizenship Provisions of 28 U.S.C.A. § 1332(a)*, 100 A.L.R. FED. 700 (1990).

181. Harbach, *supra* note 7, at 143 n.46 ("Few of what are regarded as the foundational cases arose in the context of diversity jurisdiction.").

182. *In re* Burrus, 136 U.S. 586, 596-97 (1890).

183. Perrine v. Slack, 164 U.S. 452, 453 (1896).

184. Simms v. Simms, 175 U.S. 162, 168-69 (1899).

185. De la Rama v. De la Rama, 201 U.S. 303, 308 (1906).

186. Ohio *ex rel.* Popovici v. Agler, 280 U.S. 379, 382 (1930).

187. U.S. CONST. art. III, § 2, cl. 1.

188. Barber v. Barber *ex rel.* Cronkhite, 62 U.S. (21 How.) 582, 583-84 (1858).

189. Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 17 (2004).

190. 409 U.S. 810 (1972).

191. *See, e.g.*, Andrew Janet, Note, *Eat, Drink, and Marry: Why* Baker v. Nelson *Should Have No Impact on Same-Sex Marriage Litigation*, 89 N.Y.U. L. REV. 1777 (2014); Robert Barnes, *Supreme Court: Was Gay Marriage Settled in 1972 Case?*, WASH. POST (Aug. 17, 2014), http://www.washingtonpost.com/politics/courts_law/supreme-court-was-gay-marriage-settled-in-1972-case/2014/08/17/1a5e41f8-23c6-11e4-86ca-6f03cbd15c1a_story.html [http://perma.cc/DD8Q-ECBK]; Lyle Denniston, *Gay Marriage and* Baker v. Nelson, SCOTUSBLOG (July 4, 2012, 4:52 PM), http://www.scotusblog.com/2012/07/gay-marriage-and-baker-v-nelson [http://perma.cc/YX3V-RNR3]; Lyle Denniston, *Testing the Status of* Baker v. Nelson,

CC

"based upon the domestic relations exception."[192] *Baker* involved an appeal from a judgment by the Minnesota Supreme Court upholding a ban on same-sex marriage.[193] The state argued that "[i]t is well established that each state under its own power of sovereignty has the power . . . [and] duty to carefully regulate its citizens in their domestic relationships."[194] It referenced the "landmark"[195] case of *Williams v. North Carolina*, quoting its language concerning a "most important aspect of our federalism whereby 'the domestic relations of husband and wife . . . were matters reserved to the States' . . . and do not belong to the United States."[196] *Baker* dismissed the appeal "for want of a substantial federal question."[197] There is thus "a powerful argument . . . that the Court dismissed the appeal" on jurisdictional grounds "based upon the domestic relations exception."[198]

From its inception through the twenty-first century, the Supreme Court has applied the domestic-relations exception in federal-question cases. Those who claim that it applies only to diversity jurisdiction must account for this longstanding practice.

All of these arguments seem to present a colorable case for applying the domestic-relations exception in federal-question cases. However, as the next Part establishes, they individually and collectively fail. They rely on dubious historical claims, ignore sound principles of statutory interpretation, and disregard the text and purpose of Article III.

## III. THE CASE AGAINST APPLYING THE EXCEPTION TO FEDERAL QUESTIONS

The domestic-relations exception does not and cannot, as a matter of positive law, limit federal-question jurisdiction. Article III and sound principles of statutory interpretation obligate federal courts to adjudicate federal questions, whether or not they involve domestic-relations issues. First, as a matter of constitutional structure, the federal courts must have jurisdiction

---

SCOTUSBLOG (Oct. 28, 2014, 4:50 PM), http://www.scotusblog.com/2014/10/testing-the -status-of-baker-v-nelson [http://perma.cc/52QC-49WV].

192. Emergency Application, *supra* note 13, at 16.

193. Baker v. Nelson, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed*, 409 U.S. 810.

194. Appellee's Motion To Dismiss Appeal and Brief at 3, *Baker*, 409 U.S. 810 (No. 71-1027).

195. *Id.*

196. 325 U.S. 226, 233 (1945) (quoting Ohio *ex. rel.* Popovici v. Agler, 280 U.S. 379, 383-84 (1930)).

197. 409 U.S. 810.

198. Emergency Application, *supra* note 13, at 16.

over all federal-question cases. Additional, related structural considerations compel the conclusion that the Supreme Court itself must have authority over such cases, regardless of whether lower federal courts do as well. Second, as a matter of statutory interpretation, the federal-jurisdiction statutes provide that federal jurisdiction extends to federal questions regardless of whether they involve domestic relations. Finally, invoking the values of federalism and parity between state and federal courts is insufficient to justify expanding the domestic-relations exception to federal questions, because letting federal courts decide federal questions that involve domestic relations better serves those values than leaving such cases entirely to the state courts.

### A. The Constitutional Argument: Applying the Exception to Federal Questions Would Violate Article III

Article III extends federal jurisdiction to all federal questions, including those initially brought in state courts. In addition, it requires that the U.S. Supreme Court have jurisdiction to review all cases heard in lower federal courts. When state courts hear federal questions, appeal must lie in federal court—specifically, in the Supreme Court. The domestic-relations exception cannot rob federal courts of the jurisdiction that Article III confers.

#### 1. Federal Questions Involving Domestic Relations Are Cases in "Law" or "Equity"

The original public meaning of Article III gives the federal courts jurisdiction over federal-question cases that involve domestic relations. The Constitution gives the federal judiciary power over all federal-question cases, irrespective of whether they touch on domestic relations. Article III commands that federal judicial power "shall extend to *all* Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."[199] Any constitutional challenge to a law necessarily "aris[es] under [the] Constitution"; any challenge based on a federal statutory right necessarily "aris[es] under . . . the Laws of the United States."[200] The federal courts thus have jurisdiction over such challenges involving domestic relations so long as such domestic-relations cases can be characterized as cases in "law" or "equity." Can they? To determine whether a case arises in law or equity, courts usually look to the nature of the remedy

---

**199.** U.S. CONST. art. III, § 2, cl. 1 (emphasis added).

**200.** *Id.*

sought.[201] A party challenging a statute's lawfulness will usually seek to enjoin its enforcement. The injunction is an equitable remedy. Suits seeking to enjoin a law's enforcement on constitutional or federal-law grounds are therefore cases in equity, subject to federal jurisdiction.

As Section II.A explained, the argument that domestic-relations cases fall beyond the scope of Article III jurisdiction rests on the claim that English law and equity courts could not hear domestic-relations cases because the ecclesiastical courts had exclusive jurisdiction over them. This account, however, oversimplifies the jurisdictional complexities of English domestic-relations law and disregards colonial practice. Article III extends federal jurisdiction to all cases in "Law and Equity." At the time of and leading up to the Constitution's ratification, English equity courts regularly heard cases raising family law issues.[202] Notwithstanding the *In re Burrus* dictum,

---

201. *See* DAVID I. LEVINE ET AL., REMEDIES: PUBLIC AND PRIVATE 452 (5th ed. 2009) ("[W]hether the relief sought should be characterized as legal or equitable turns on how the court's order would be enforced. Equity courts ordered defendants, personally, to act, and enforced their orders by their contempt power. Law courts relied on separate administrative proceedings to enforce their judgments.").

202. Ecclesiastical courts had exclusive jurisdiction over "[m]atrimonial causes," until the Divorce and Matrimonial Causes Act of 1857, 20 & 21 Vict. c. 85 (Eng.), was passed. Calabresi & Sinel, *supra* note 25, (manuscript at 5). Nonetheless, historically the courts of equity heard marital cases frequently. Equity courts

> gave security to women who held real and personal estates by means of future equitable interests not recognised at the common law, granted protection to the estate of the jointress and accorded a right to separated or divorced women to take a share of their husband's estate commensurate with the portion which they brought into marriage.

MARIA L. CIONI, WOMEN AND LAW IN ELIZABETHAN ENGLAND WITH PARTICULAR REFERENCE TO THE COURT OF CHANCERY, at i (1985). In certain circumstances, equity courts even let women sue their husbands. *Id.* at 30; TIM STRETTON, WOMEN WAGING LAW IN ELIZABETHAN ENGLAND 143-54 (1998). Equity courts offered married women an alternative to the common-law courts for asserting judicially enforceable rights. *See* MARY R. BEARD, WOMAN AS FORCE IN HISTORY: A STUDY IN TRADITIONS AND REALITIES 136-44, 198-204 (1946); STRETTON, *supra*, at 25-26. Through the doctrine of the "separate estate," equity courts could evade coverture, "the common law fiction that a married woman had virtually no legal identity separate from her husband," and even allowed married women to sue their husbands. STRETTON, *supra*, at 26-28.

> The Court of Requests, a "'poor man's Chancery,' a national equity court which flourished for just over a century and a half between the time of Henry VII and the onset of the Civil War," *id.* at 7, was also hospitable to women's marital claims, *id.* at 129-54 (providing a broad overview of the litigation patterns of married women in the Court of Requests, including suits by women both with and against their husbands). Female litigants in the Court of Requests were common. *Id.* According to Tim Stretton, "On average one third of the cases that came before the 'Masters', or judges, of Requests involved a female

considerably less than "[t]he *whole subject* of the domestic relations"[203] belonged to the English ecclesiastical courts. This suggests that some early domestic-relations precedents in federal-question cases discussed in Section II.C, such as *Popovici*[204] and Justice Daniel's dissent in *Barber*,[205] are entitled to little weight because they relied on erroneous history.[206]

Whatever the relevance of English practice to the scope of the exception may be, one should also look to the American colonial experience, which is a more appropriate source of the original public meaning of the jurisdictional terms in Article III. Importantly, ordinary American colonial courts regularly

plaintiff or defendant. . . . [They] were accustomed to dealing with women litigants in numbers every day the court was in session." *Id.* (citations omitted).

Marriage cases, especially those based on married women's property or alimony claims, also regularly came to the chancery courts. Allison Anna Tait, *The Beginning of the End of Coverture: A Reappraisal of the Married Woman's Separate Estate*, 26 YALE J.L. & FEMINISM 165, 208 n.255 (2014) ("Marital litigation could occur in various fora including but not limited to Chancery."). For a review of the claims brought by married women in chancery courts, see *id.* at 207-11. As one commentator put it, chancery courts "laid the foundations for married women's property rights." CIONI, *supra*, at i. Chancery courts were "careful not to tread too heavily on ecclesiastical jurisdiction and maintained a policy of avoiding inquiry into the merits of marital disputes." Tait, *supra*, at 208. As one chancery court acknowledged, the "Ecclesiastical Court . . . has exclusive cognizance of the rights and duties arising from the state of marriage." Legard v. Johnson (1797) 30 Eng. Rep. 1049, 1052, 3 Ves. Jun. 352, 359. Nonetheless, chancery courts did not abstain from hearing cases that raised marital questions, especially those involving "questions relating to the regulation of trusts." Tait, *supra*, at 208 ("The controlling factor in Chancery's taking jurisdiction in these cases was the presence of questions relating to the regulation of trusts."). Another commentator has observed that the sort of married women's claims heard in chancery courts can generally be sorted "broadly into two camps: proprietary . . . and contractual." Michael Macnair, *The Conceptual Basis of Trusts in the 17th and 18th Centuries*, in ITINERA FIDUCIAE: TRUST AND TREUHAND IN HISTORICAL PERSPECTIVE 207, 235 (Richard Helmholz & Robert Zimmermann eds., 1998). On rare occasions, English equity courts even dissolved marriages. *See, e.g.*, Terrell v. Terrell (1581) 21 Eng. Rep. 104, 123, Tothill 4, 59 (issuing two divorce decrees); 1 GEORGE SPENCE, THE EQUITABLE JURISDICTION OF THE COURT OF CHANCERY 702 (Philadelphia, Lea and Blanchard 1846) ("It is not unlikely, however, that the Court of Chancery, under its clerical chancellors, exercised jurisdiction to decree a divorce *a vinculo matrimonii*.").

203. 136 U.S. 586, 593-94 (1890) (emphasis added).

204. Ohio *ex rel.* Popovici v. Agler, 280 U.S. 379, 383 (1930).

205. Barber v. Barber *ex rel.* Cronkhite, 62 U.S. (21 How.) 582, 604-05 (1858) (Daniel, J., dissenting).

206. As seen *supra* Section I.A, not all early domestic-relations cases invoked this reasoning. Some, such as *In re Burrus*, gave no reasoning at all, 136 U.S. at 593-94, while others, such as *De la Rama v. De la Rama*, asserted that domestic-relations cases cannot satisfy the technical requirements of diversity jurisdiction, 201 U.S. 303, 308 (1906), a rationale that neither applies exclusively to domestic-relations matters nor necessarily always applies to particular domestic-relations controversies. Thus, these cases are also entitled to little weight.

exercised jurisdiction over domestic-relations matters. Even if Justice Daniel were correct that in England, cases involving marriage, divorce, and alimony belonged exclusively to the ecclesiastical courts,[207] the early American colonies did not have ecclesiastical courts, so the ordinary colonial law and equity courts absorbed that jurisdiction.[208] Because there was no American ecclesiastical jurisdiction, American equity jurisdiction absorbed ecclesiastical cases. Crucially, jurisdictional labels generally meant little in the American colonies. Colonial courts were regularly given names that did not correspond to the function of similarly named courts in England.[209] Because ordinary American

---

207. *Barber*, 62 U.S. (21 How.) at 604-05.

208. Erwin C. Surrency, *The Courts in the American Colonies*, 11 AM. J. LEGAL HIST. 253, 275 (1967) ("As no ecclesiastical courts were established in the colonies, the governors of the royal colonies were authorized to assume the jurisdiction over matters arising from the administration and the probate of wills."). Probate cases, "which came within the jurisdiction of the ecclesiastical courts in England, were generally handled in America by the governor." *Id.* at 253. Meanwhile, chancery courts, though "a well-established part of the English judicial system at the time of settlement of the American colonies," were mostly nonexistent in the American colonies. *Id.* at 271 ("[F]ew of these courts were established permanently in the colonies."). The significance of the fact that the early American colonies did not have ecclesiastical courts to the issue of the domestic-relations exception has not entirely escaped judicial attention. *See, e.g.*, Lloyd v. Loeffler, 694 F.2d 489, 491-92 (7th Cir. 1982) ("The usual account of the domestic relations exception . . . assumes without discussion that the proper referent is English rather than American practice, though if only because there was no ecclesiastical court in America [and] American law and equity courts had a broader jurisdiction in family-law matters than their English counterparts had."). Although asserting that "[p]robably the reference to law and equity in the first judiciary act is mainly to English practice rather than to the diverse judicial systems of the colonies and states," *Lloyd* acknowledges that "it would be odd if the jurisdiction of England's ecclesiastical courts, theocratic institutions unlikely to be well regarded in America, should have been thought to define the limits of the jurisdiction of the new federal courts." *Id.* at 492.

209. In general, colonial jurisdictional boundaries were hazy and ill-defined. "[T]he colonists never created the numerous courts with limited jurisdiction similar to those found in England at that period," and as a result colonial courts often "combined the jurisdiction generally exercised by different courts in England." Surrency, *supra* note 208, at 261. While "[a]ttempts were made to introduce courts baron, an exchequer court, and a few others," all failed. *Id.* Even when colonists created different courts, they "were not consistent in the titles given" to them. *Id.* at 267 ("[T]he records revealed significant changes in titles."). Oftentimes "the title of the same court was confusing for it was not given precisely, and the petitioners would address it differently." *Id.* at 254. Although "English courts were taken as a model," in practice, names were affixed to courts "which had little resemblance to their namesakes." *Id.* at 263. Erwin Surrency summarizes the situation in the colonies as follows:

> The courts in the American colonies were patterned after those in England, but often the American variety bore little resemblance to the English prototype. The names may have been the same, but the jurisdiction and the operation of the courts varied greatly, and hence the American variety bore little resemblance to the English courts.

THE YALE LAW JOURNAL                                    125:1364   2016

courts exercised jurisdiction over domestic-relations cases, Founding-era Americans likely would have understood the Article III phrase "Law and Equity" to encompass all of the jurisdiction that ordinary American courts exercised at the time, including jurisdiction over domestic relations. A more restrictive construction of those terms would also be inconsistent with the colonial legal culture from which the Constitution itself emerged. Consider, for example, that Oliver Ellsworth, the Chief Justice of Connecticut, whose colonial courts granted divorces,[210] was a main drafter of the diversity-jurisdiction provisions in the Judiciary Act of 1789,[211] which mirrored the language of Article III of the Constitution.

In sum, English and colonial practice shows that family-law disputes have always fallen within the scope of cases in "law" and "equity" as those terms have been understood in America. Under Article III, a federal question is a case "in Law and *Equity*,"[212] to which federal jurisdiction extends, regardless of whether it raises domestic-relations issues. If the exception's historicity depends on the claim that the Founding-era Americans believed domestic relations to belong exclusively to the English ecclesiastical courts, it rests on shaky ground.[213]

### 2. *Appeals from State Court Federal Question Judgments Must Always Lie in Federal Court*

The existence of federal jurisdiction over all federal questions, including those that involve domestic relations, is also evident in Article III's elegant jurisdictional framework. Article III uses broad, obligatory language, which strongly suggests that the federal judiciary must have jurisdiction over federal-question cases. As Akhil Reed Amar has famously argued, the use of the word

---

*Id.* at 266. As such, "one should not conclude that a separate type of court existed because another title is found in use or is referred to by varying names in contemporary sources." *Id.* at 267.

210. *See* 2 GEORGE ELLIOTT HOWARD, A HISTORY OF MATRIMONIAL INSTITUTIONS 353-60 (photo. reprint 1999) (1904).

211. Charles Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 HARV. L. REV. 49, 50, 59-61 (1923).

212. U.S. CONST. art. III, § 2, cl. 1 (emphasis added).

213. Some federal courts have recognized this fact. *See, e.g.*, Lynk v. LaPorte Superior Court No. 2, 789 F.2d 554, 558 (7th Cir. 1986) ("The existence of the exception rests on dubious historical, but powerful pragmatic, grounds."); *Lloyd*, 694 F.2d at 491 ("The historical account is unconvincing."); *see also* 13E WRIGHT ET AL., *supra* note 1, § 3609 (noting that the "debate over the accuracy of this historic characterization [of the domestic-relations exception] has cast doubt on the legitimacy of that rationale").

"all" before heads of jurisdiction over federal-question cases, and the absence of "all" before heads of jurisdiction over diversity cases, makes for a striking contrast, strongly indicating that federal-question jurisdiction is mandatory and diversity jurisdiction is permissive.[214] As Justice Story declared in *Martin v. Hunter's Lessee*, an early Supreme Court case concerning the scope of federal jurisdiction, "It is hardly to be presumed that the variation in the language could have been accidental."[215] Indeed, records from the Constitutional

---

**214.** Akhil Reed Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U. L. REV. 205, 240 (1985) [hereinafter Amar, *Two Tiers of Federal Jurisdiction*] ("Nine specific—and overlapping—categories of cases are spelled out . . . but these categories are not all of equal importance. The judicial power must extend to 'all' cases in the first three categories; not so with the final six enumerated categories, where the word 'all' is nowhere to be found. The implication of the text, while perhaps not unambiguous, is strong: although the judicial power must extend to all cases in the first three categories, it may, but need not, extend to all cases in the last six."). Article III, Section 2 reads, in relevant part:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State,—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. CONST. art. III, § 2, cl. 1. As Amar notes, "'All' is used not once, not twice, but three separate times in the opening sentence of section 2. The word is then omitted six times. This selective repetition and omission tends to confirm the presumption of intentional insertion." Amar, *Two Tiers of Federal Jurisdiction*, *supra*, at 242. Amar has discussed and elaborated on this argument in a series of books and articles, including AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 227-29 (2005) [hereinafter AMAR, AMERICA'S CONSTITUTION]; Akhil Reed Amar, *Reports of My Death Are Greatly Exaggerated: A Reply*, 138 U. PA. L. REV. 1651 (1990); Akhil Reed Amar, *Taking Article III Seriously: A Reply to Professor Friedman*, 85 NW. U. L. REV. 442 (1991); and Akhil Reed Amar, *The Two-Tiered Structure of the Judiciary Act of 1789*, 138 U. PA. L. REV. 1499 (1990) [hereinafter Amar, *Two-Tiered Structure*].

**215.** Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 334 (1816); *see also* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it."); Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 242 ("The selective use by the Framers of the word 'all' may not be lightly presumed to be unintentional. Where possible, each word of the Constitution is to be given meaning; no words are to be ignored as mere surplusage."). Amar notes that

> the presumption of intentional insertion . . . is further strengthened by the next sentence of Article III, which carefully modifies the cases affecting public ambassadors falling within the Supreme Court's original jurisdiction with the qualifier "all," thus harmonizing with the language of the jurisdictional menu: "In

Convention confirm that the Framers used and omitted the word "all" purposefully when writing Article III to create categories of obligatory and permissive jurisdiction.[216] As they repeatedly revised Article III's text, the judiciary's "two-tiered" structure of obligatory and permissive jurisdiction came into greater focus.[217] The resulting text of Article III indicates that federal courts must have power to hear federal-question cases, while Congress may limit the scope of their jurisdiction over diversity cases through the "exceptions and regulations" clause.[218]

This all suggests that even if Congress or the courts could carve out a domestic-relations exception to diversity jurisdiction, the Constitution forbids such an exception to the mandatory federal-question jurisdiction it vests in the federal courts. That conclusion is buttressed by the observation that the word "all" mirrors another obligatory phrase[219] found near the beginning of Article III, Section 2: "The judicial Power *shall* extend . . . ."[220] As Robert N. Clinton has observed, the Framers regularly used the word "shall" in an obligatory fashion.[221] Altogether, as *Martin* recognized, "The language of . . . [A]rticle

---

all Cases affecting Ambassadors, other public Ministers and Consuls, . . . the supreme Court shall have original Jurisdiction."

*Id.* (citations omitted) (quoting U.S. CONST. art. III, § 2, cl. 2).

216. Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 242 ("The records of the Constitutional Convention also strongly corroborate the notion that the Framers used the word 'all' intentionally and with care, purposefully establishing a two-tiered jurisdictional structure."). For more on the historical evidence from the Constitutional Convention that the Framers intended to create a two-tiered system of federal jurisdiction, see *id.* at 242-45, which details the series of revisions made to the original draft of Article III.

217. *See id.* at 242. *Compare* 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 46 (Max Farrand ed., 1911) [hereinafter RECORDS] (showing the Constitutional Convention's initial resolution concerning the subject of federal jurisdiction, whose specific vocabulary choices gestured toward a nascent two-tiered jurisdictional structure), *with id.* at 146-47 (showing the first draft of the Committee of Detail produced by Edmund Randolph and John Rutledge, which reflected an embryonic two-tiered jurisdictional structure), *id.* at 172-73 (showing a later draft by James Wilson and John Rutledge, which preserved the two-tiered structure of the prior draft), *id.* at 576 (showing the draft produced by the Committee of Style, which omitted the word "all" in establishing the Supreme Court's original jurisdiction), *and id.* at 661 (showing the final draft, which included the word "all").

218. *See* U.S. CONST. art. III, § 2, cl. 3; Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 240-41.

219. *See* Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 215 ("These are words of obligation . . . . Unless clearly overruled or modified by other language of the Constitution, this mandatory language must be given effect.").

220. U.S. CONST. art. III, § 2, cl. 1 (emphasis added).

221. Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided Quest for the Original Understanding of Article III*, 132 U. PA. L. REV. 741, 782 (1984). As Clinton explained:

[III] throughout is manifestly designed to be mandatory upon the legislature. Its obligatory force is so imperative that congress could not, without a violation of its duty, have refused to carry it into operation."[222]

The Framers created this two-tiered structure because they feared that without a federal forum to resolve federal questions, state judges would undermine the Constitution by refusing to give it effect.[223] The federal

> [T]he Wilson-Rutledge draft and the Committee report retained the mandatory phrase "shall extend" when referring to the jurisdiction of the Supreme Court. This phrase had been included in the original Randolph plan and its various amendments during the early portion of the Convention deliberations. The Convention and the Committee apparently invoked "shall" in its mandatory sense rather than as future tense. The repeated consensus on the need for judicial independence and the fear of legislative encroachment on judicial powers strongly suggest that the framers did not intend to create any congressional power to determine the scope of jurisdiction of the federal judiciary. Indeed, no suggestion of any congressional power to determine jurisdiction was voiced in the earlier Convention deliberations. When a suggestion for congressional power over jurisdiction did briefly surface in the Randolph-Rutledge draft, the drafters carefully used the discretionary "may assign," as they also did when referring to congressional power to distribute judicial powers to inferior federal courts. Thus, the drafters fully understood the difference between the mandatory "shall" and the discretionary "may," and almost invariably used "shall" where a mandatory obligation was intended.

*Id.*; *see also* Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 231 ("These opening words of Article III are rich with meaning. [T]hey establish that the judicial power of the United States *must* be vested in the federal judiciary as a whole.").

222. Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 328 (1816). *Martin* stressed that "[t]he judicial power of the United States *shall be vested* (not may be vested) in one supreme court, and in such inferior courts as congress may, from time to time, ordain and establish." *Id. Martin* then discussed in further detail the obligatory nature of the usage of the word "shall" in Article III. *Id.* at 328-30; *see also* Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 215 n.41 ("The 'shall' language can be read as authorizing, rather than obliging, federal jurisdiction, but the branch that is thereby empowered is the federal judiciary, not Congress. Thus, even if the Article III empowerment can be declined by the federal judiciary, it must be honored by—and is therefore mandatory vis-à-vis—Congress.").

223. In a letter to Thomas Jefferson, James Madison described "[t]he mutability of the laws of the States" as "a serious evil," whose "injustice . . . has been so frequent and so flagrant as to alarm the most ste[a]dfast friends of Republicanism." 5 THE WRITINGS OF JAMES MADISON 27 (Gaillard Hunt ed., 1904). He believed that the "evils" of the states "contributed more to that uneasiness which produced the Convention, and prepared the Public mind for a general reform" than those of the national government under the Articles of Confederation, and he thought that any "reform" that did not "make provision for private rights" as against the states "must be materially defective." *Id.* As Amar notes, the idea of a federal judiciary that would protect the Constitution against nonenforcement by state courts is consistent with "the entire Federalist enterprise of establishing a new and stronger federal government[, which] was largely conceived of as a way to erect a strong bulwark of individual rights

jurisdictional framework was designed so that federal questions need not be settled in the final instance by state courts; review would always lie in federal tribunals.[224] In contrast, the Framers did not find it especially important to vest

---

against overweening state governments." Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 247 n.134.

224. Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 249 ("[T]he clear understanding of the Convention was that state court decisions must be reviewable by the national judiciary."). The Federalists did not trust the state courts. 3 RECORDS, *supra* note 217, at 207 (including the statement of Luther Martin). Madison stated, "Confidence can (not) be put in the State Tribunals as guardians of the National authority and interests. In all the States these are more or less depend[ent] on the Legislatures." 2 *id.* at 27-28. Madison did not want to give the entire task of upholding the Constitution over to the "biassed [*sic*] directions of a dependent [state] Judge." 3 THE WRITINGS OF JAMES MADISON, *supra* note 223, at 97. Edmund Randolph's warning was just as stark: "[T]he Courts of the States [cannot] be trusted with the administration of the National laws." 2 RECORDS, *supra* note 217, at 46. The Convention's intention that appellate review of state-court decisions concerning federal questions would lie in the federal courts is expressed clearly in Madison's letter to Jefferson:

> We arrive at the agitated question whether the Judicial Authority of the U. S. [*sic*] be the constitutional resort for determining the line between the federal & State jurisdictions. Believing as I do that the General Convention regarded a provision within the Constitution for deciding in a peaceable & regular mode all cases arising in the course of its operation, as essential to an adequate System of Gov[ernment] that it intended the Authority vested in the Judicial Department as a final resort in relation to the States, for cases resulting to it in the exercise of its functions, (the concurrence of the Senate chosen by the State Legislatures, in appointing the Judges, and the oaths & official tenures of these, with the surveillance of public Opinion, being relied on as guarantying their impartiality); and that this intention is expressed by the articles declaring that the federal Constitution & laws shall be the supreme law of the land, and that the Judicial Power of the U. S. [*sic*] shall extend to all cases arising under them: Believing moreover that this was the prevailing view of the subject when the Constitution was adopted & put into execution; that it has so continued thro[ugh] the long period which has elapsed; and that even at this time an appeal to a national decision would prove that no general change has taken place: thus believing I have never yielded my original opinion indicated in the "Federalist" N[o.] 39 to the ingenious reasonings of Col: [*sic*] Taylor ag[ainst] this construction of the Constitution.

9 THE WRITINGS OF JAMES MADISON, *supra* note 223, at 141-42. Madison expressed this view once again in the Federalist Papers: "[I]n controversies relating to the boundary between the two [federal and state] jurisdictions, the tribunal which is ultimately to decide, is to be established under the general government." THE FEDERALIST NO. 39, at 245 (James Madison) (Clinton Rossiter ed., 1961); *see also* RAOUL BERGER, CONGRESS V. THE SUPREME COURT 286 n.6 (1969) ("[I]t was only 'initial,' original, *not final*, jurisdiction that was to be 'left to the state courts,' subject to an appeal to the Supreme Court."). When ratification of the Constitution was being debated in Connecticut, Oliver Ellsworth explained that the federal judiciary would be a check both on federal laws that extend beyond Congress's enumerated powers *and* state laws that impinge on federal power:

federal courts with diversity jurisdiction, which presented state judges few opportunities to undermine the Constitution and only did so ambivalently.[225]

As Amar argues, the Constitution has four structural features that make federal judges superior to their state counterparts to adjudicate federal-question disputes. First, because federal judges have life tenure during good behavior and cannot see their salaries diminished, they possess a degree of political independence and impartiality that state judges may lack.[226] Second,

---

> If the general legislature should at any time overleap their limits, the judicial department is a constitutional check. If the United States go beyond their powers, if they make a law which the Constitution does not authorize, it is void; and the judicial power, the national judges, who to secure their impartiality, are to be made independent, will declare it to be void. On the other hand, if the states go beyond their limits, if they make a law which is a usurpation upon the federal government the law is void; and upright, independent judges will declare it to be so.

3 RECORDS, *supra* note 217, at 240-41.

225. *See* Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 245 n.130 (surveying the views of the Framers and showing that they did not believe it was very important to vest the federal judiciary with diversity jurisdiction). According to Madison, diversity jurisdiction was not "a matter of much importance. Perhaps it might be left to the state courts." 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 533 (Jonathan Elliot ed., 2d ed. 1901) [hereinafter DEBATES]. Edmund Randolph felt similarly, saying he did "not see any absolute necessity for . . . [federal diversity] jurisdiction in these cases." 3 *id.* at 572. Other Framers felt the same way, such as Edmund Pendleton, 3 *id.* at 549 ("[T]hose decisions might be left to the state tribunals."); John Marshall, 3 *id.* at 556 ("Were I to contend that [diversity jurisdiction] was necessary in all cases, and that the government without it would be defective, I should not use my own judgment."); and James Wilson, 2 *id.* at 491 ("[Diversity] jurisdiction, I presume, will occasion more doubt than any other part . . . ."). As Charles Lee asserted before the Supreme Court, "The jurisdiction given to the federal courts in cases between citizens of different states, was, at the time of the adoption of the constitution, supposed to be of very little importance to the people." Hepburn v. Ellzey, 6 U.S. (2 Cranch) 445, 450 (1805).

226. U.S. CONST. art. III, § 1 ("The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."); Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 235 ("By virtue of their tenure and salary guarantees, Article III judges are constitutionally assured the structural independence to interpret and pronounce the law impartially. No such constitutional guarantee applies for state judges."). Alexander Hamilton asserted that the proposed Constitution's salary provision "bears every mark of prudence and efficacy; and it may be safely affirmed that, together with the permanent tenure of their offices, it affords a better prospect of their independence than is discoverable in the constitutions of any of the States in regard to their own judges." THE FEDERALIST NO. 79, *supra* note 224, at 473-74 (Alexander Hamilton). This attitude also found expression in early Supreme Court decisions. In *Martin*, the Court observed that "[t]he constitution has presumed . . . that state attachments, state prejudices, state jealousies, and state interests, might sometimes obstruct, or control, or be supposed to

federal judges are chosen by the President and confirmed by the Senate, while state judges are not,[227] a process "designed to promote a high level of prestige and competence in the federal judiciary that could not be guaranteed at the state level."[228] Third, federal judges are "officers of the nation . . . hold[ing] national commissions," "speak[ing] in the name of the nation," and "paid out of the national treasury."[229] Finally, the Constitution makes federal judges accountable to the entire nation by providing a mechanism for their impeachment, but it creates no corresponding impeachment process for state judges.[230]

---

obstruct or control, the regular administration of justice." Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 347 (1816). Five years later, it said:

> It would be hazarding too much to assert, that the judicatures of the States will be exempt from the prejudices by which the legislatures and people are influenced, and will constitute perfectly impartial tribunals. In many States the judges are dependent for office and for salary on the will of the legislature. The constitution of the United States furnishes no security against the universal adoption of this principle. When we observe the importance which that constitution attaches to the independence of judges, we are the less inclined to suppose that it can have intended to leave these constitutional questions to tribunals where this independence may not exist . . . .

Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 386-87 (1821).

**227.** U.S. CONST. art. II, § 2, cl. 2 ("[H]e shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law . . . ."). Note that Article II lacks any analogous conferral of power on the President to nominate and appoint state judges.

**228.** Amar, *Two Tiers of Federal Jurisdiction, supra* note 214, at 236.

**229.** *Id.* At North Carolina's ratifying convention, Archibald Maclaine said:

> [I]f they be the judges of the local or state laws, and receive emoluments for acting in that capacity, they will be improper persons to judge of the laws of the Union. A federal judge ought to be solely governed by the laws of the United States, and receive his salary from the treasury of the United States. It is impossible for any judges, receiving pay from a single state, to be impartial in cases where the local laws or interests of that state clash with the laws of the Union, or the general interests of America.

4 DEBATES, *supra* note 225, at 172.

**230.** *See* U.S. CONST. art. II, § 4 ("The President, Vice President and *all civil Officers of the United States*, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." (emphasis added)). In *The Federalist No. 81*, Alexander Hamilton discussed

> the important constitutional check which the power of instituting impeachments . . . would give [Congress] upon the members of the judicial department. This is alone a complete security. There never can be danger that the judges, by a series of deliberate usurpations on the authority of the legislature, would hazard the

FEDERAL QUESTIONS AND THE DOMESTIC-RELATIONS EXCEPTION

Two early Supreme Court cases, authored by two of the most celebrated constitutional expositors in American history, confirm that the Constitution was designed to ensure that state courts would not have the last word on federal questions. First, *Martin*, discussed above, held that the Supreme Court had the power to review federal-question judgments by state courts.[231] Justice Story explained that this process ensures that federal courts, not state courts, would in the final instance get to resolve disputes over the meaning of federal law: even though "the judges of the state courts are, and always will be, of as much learning, integrity, and wisdom, as those of the courts of the United States,"[232] he said, the Constitution nonetheless reflects the assumption "that state attachments, state prejudices, state jealousies, and state interests, might sometimes obstruct, or control, or be supposed to obstruct or control, the regular administration of justice."[233] Later, in *Cohens v. Virginia*, the Court rejected the contention that the Supreme Court lacked jurisdiction over criminal cases or cases in which a state was a party.[234] Writing for the Court, Chief Justice Marshall stressed that state courts could not always be trusted to adjudicate impartially disputes arising under federal law, free of "the prejudices

---

united resentment of the body intrusted with it, while this body was possessed of the means of punishing their presumption, by degrading them from their stations.

THE FEDERALIST NO. 81, *supra* note 224, at 485 (Alexander Hamilton); *see also* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1583, at 447 (1833) ("[J]udges of the state courts would be wholly irresponsible to the national government for their conduct in the administration of national justice . . . ."). Amar points out that while the Article II impeachment mechanism ensured a degree of accountability for federal judges, "[t]he limitations on federal impeachment are equally important: unlike state judges, Article III judges may be removed from office only for misbehavior, and not merely because legislators dislike them for partisan and political reasons—or for no reason." Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 237.

231. *Martin*, 14 U.S. (1 Wheat.) at 342 ("It was foreseen that in the exercise of their ordinary jurisdiction, state courts would incidentally take cognizance of cases arising under the constitution, the laws, and treaties of the United States. Yet to all these cases the judicial power, by the very terms of the constitution, is to extend.").

232. *Id.* at 346.

233. *Id.* at 347.

234. *See* Cohens v. Virginia, 19 U.S. (1 Wheat.) 264, 302 (1821) (reproducing Virginia's argument that "considering the nature of this case, and that a State is a party, the judicial power of the United States does not extend to the case, and that, therefore, this Court cannot take jurisdiction at all"). The petitioner rejected this claim, asserting that "[t]his is a case arising under the constitution and laws of the Union, and therefore the jurisdiction of the federal Courts extends to it by the express letter of the constitution, and the case of *Martin v. Hunter* has determined that this jurisdiction may be exercised by this Court in an appellate form." *Id.* at 345.

by which the legislatures and people are influenced."[235] After all, Marshall reasoned, "[i]n many States the judges are dependent for office and for salary on the will of the legislature," whereas the Federal Constitution provided for the independence of federal judges.[236]

For these reasons, whenever state courts hear federal questions, appeal must lie in some federal court. To place federal-question cases involving domestic relations beyond the scope of federal jurisdiction would vest some of the "judicial Power of the United States"[237] in the state judiciaries, violating the clear text of the Article III Vesting Clause. One implication is that the Supreme Court itself must have jurisdiction over all cases that raise federal questions, regardless of whether they involve domestic relations. As Steven Calabresi and Gary Lawson have argued, "Article III requires that the federal judiciary be able to exercise *all* of the judicial power of the United States that is vested by the Constitution and that the Supreme Court must have the final judicial word in *all* cases . . . that raise federal issues."[238]

Calabresi and Lawson derive this conclusion from the constitutionally evident hierarchical relationship between one "Supreme" Court and other federal courts that are "inferior" to it.[239] According to them, the Supreme Court must have either original or appellate jurisdiction over any case in the lower federal courts, or else it would not be truly "Supreme" over them.[240] Article III's hierarchical relationship between the "*supreme* Court" and "*inferior* Courts"[241] thus parallels Article II's command chain between "*a* President"[242] and "*inferior* [executive] Officers."[243] *Edmond v. United States* recognized as a

---

235. *Id.* at 386.

236. *Id.* at 386-87.

237. *See* U.S. CONST. art. III, § 1, cl. 1.

238. Steven G. Calabresi & Gary Lawson, *The Unitary Executive, Jurisdiction Stripping, and the* Hamdan *Opinions: A Textualist Response to Justice Scalia*, 107 COLUM. L. REV. 1002, 1005 (2007) (footnote omitted).

239. *Id.* at 1006 ("Similarly, the Vesting Clause of Article III vests the federal judiciary with *all* of the federal judicial power, and by designating the Supreme Court as 'Supreme' and other federal tribunals as 'inferior to' the Supreme Court, the Constitution requires the Supreme Court to have supervisory power over all subordinates within its department."); *see* U.S. CONST. art. III, § 1.

240. Calabresi & Lawson, *supra* note 238, at 1006.

241. U.S. CONST. art. III, § 1 (emphasis added).

242. *Id.* art. II, § 1, cl. 1 (emphasis added).

243. *Id.* art. II, § 2, cl. 2 (emphasis added); *see also* Calabresi & Lawson, *supra* note 238, at 1007 (arguing that just as "an [executive] officer can only be 'inferior' for purposes of the Appointments Clause if he or she has an effective superior . . . a federal court can be an 'inferior' court only if it is subject to review and correction by a superior" (footnotes omitted)).

general matter that what makes an executive officer "inferior" within the meaning of the Appointments Clause[244] is that she or he has a "superior" other than the President himself.[245] If this is true of inferior officers, it is also true of inferior courts—both must have supervisors who are "Supreme" over them, who have authority to oversee their acts undertaken in exercise of constitutional authority.[246]

Though Calabresi and Lawson speak only to the Supreme Court's relationship with inferior federal courts, their reasoning extends to its relationship with state courts hearing federal-question cases, which is analogous to that between the President and state executive officers. Whenever a state court hears a federal-question case, it exercises "[t]he judicial Power of the United States."[247] If the domestic-relations exception applies to federal questions, it puts some quantum of "[t]he judicial Power"[248] in state courts beyond the Supreme Court's supervision. This would be analogous to vesting

---

**244.** U.S. CONST. art. II, § 2, cl. 2.

**245.** 520 U.S. 651, 662 (1997) ("Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior.").

**246.** Professors Calabresi and Lawson disagree with Amar on the scope of congressional power to alter the Supreme Court's appellate jurisdiction pursuant to the Exceptions and Regulations Clause. *See* U.S. CONST. art. III, § 2, cl. 2 ("In all [nonoriginal jurisdiction cases], the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."). Amar asserts that Congress may "shift final resolution of any cases within the Supreme Court's appellate jurisdiction to any other Article III court that Congress may create." Amar, *Two Tiers of Federal Jurisdiction, supra* note 214, at 230. Calabresi and Lawson, on the other hand, say that Congress cannot strip the Supreme Court of *any* of its original or appellate jurisdiction: "Congress [may] move cases back and forth between the Supreme Court's original and appellate jurisdiction but not . . . remove cases from that jurisdiction altogether." Calabresi & Lawson, *supra* note 238, at 1008. The difference between these two views rests on whether one reads Article III, Section 1 as vesting "[t]he judicial Power of the United States," U.S. CONST. art. III, § 1, in the Supreme Court and inferior federal courts individually and severally, or in a single unit, consisting of the Supreme Court and inferior courts, within which Congress may reallocate appellate jurisdiction as it pleases. This is a challenging interpretive question, but Calabresi and Lawson's persuasive analogy between the symmetric relationships of "*a* President," *id.* art. II, § 1, cl. 1 (emphasis added), to "*inferior* [executive] Officers," *id.* art. II, § 2, cl. 2 (emphasis added), and "*one* supreme Court" to "*inferior* Courts," *id.* art. III, § 1 (emphasis added), supports reading Article III to give the Supreme Court supervisory authority over all cases in inferior federal courts. Either way, the domestic-relations exception, as applied to federal questions, is unconstitutional to the extent it would divest *all* federal courts, Supreme and inferior, of jurisdiction over federal questions involving domestic-relations issues.

**247.** U.S. CONST. art. III, § 1.

**248.** *Id.*

THE YALE LAW JOURNAL                                                          125:1364   2016

some of "[t]he executive Power"[249] in state officials who are not subject to presidential control—an arrangement that the Supreme Court in *Printz v. United States* declared unconstitutional.[250]

Article III gives the judiciary a unitary structure similar to Article II's "unitary executive."[251] It vests "[t]he judicial Power" in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."[252] To use Justice Scalia's phrasing, "this does not mean *some of*" the judicial power, "but *all of*" it.[253] Construing the exception to limit federal jurisdiction over federal questions would violate Article III's text, structure, intent, and purpose. Just as the executive power cannot be vested in state officers not subject to presidential supervision,[254] nor can the judicial power be vested in state courts unless they are subject to the Supreme Court's supervision when exercising it. If the exception were extended to federal questions, the judiciary's "unity would be shattered,"[255] and important questions of federal law would be committed exclusively to state courts, precisely those bodies that the Framers felt ought not have the final say on such matters. A faithful, holistic reading of Article III would avoid such perverse results.

---

**249.** *Id.* art. II, § 1, cl. 1.

**250.** 521 U.S. 898, 922-23 (1997) ("[U]nity in the Federal Executive . . . would be shattered, and the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him, by simply requiring state officers to execute its laws."). *See generally* THE FEDERALIST NO. 70, *supra* note 224, at 421 (Alexander Hamilton) (arguing for a unitary executive); Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power To Execute the Laws*, 104 YALE L.J. 541 (1994) (arguing that the Constitution creates a unitary executive).

**251.** For more on the "unitary executive" theory, see, for example, AMAR, AMERICA'S CONSTITUTION, *supra* note 214, at 131-32; JOHN W. DEAN, BROKEN GOVERNMENT: HOW REPUBLICAN RULE DESTROYED THE LEGISLATIVE, EXECUTIVE, AND JUDICIAL BRANCHES 102 (2007); Steven G. Calabresi & Kevin H. Rhodes, *The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 HARV. L. REV. 1153, 1165-68 (1992); Steven G. Calabresi & Nicholas Terrell, *The Fatally Flawed Theory of the Unbundled Executive*, 93 MINN. L. REV. 1696, 1696-97 (2009); and Lee S. Liberman, Morrison v. Olson*: A Formalistic Perspective on Why the Court Was Wrong*, 38 AM. U. L. REV. 313, 315 (1989). *See also* sources cited *supra* notes 238, 250.

**252.** U.S. CONST. art. III, § 1 (emphasis added).

**253.** Morrison v. Olson, 487 U.S. 654, 705 (1988) (Scalia, J., dissenting) (discussing executive power).

**254.** *Printz*, 521 U.S. at 922-23.

**255.** *Id.* at 923.

### 3. *The Domestic-Relations Exception as an Abstention Doctrine*

As noted in Section I.B, some courts that apply the domestic-relations exception in federal-question cases characterize it not as a mandatory jurisdictional bar, but as a prudential abstention doctrine.[256] Under abstention principles, federal courts decline to adjudicate certain claims when doing so would undermine federalism values.[257] Abstention doctrines are rooted in prudential principles rather than claims that federal courts inherently lack power to hear certain cases.[258] Moreover, they usually limit federal courts' power to hear certain disputes only for a limited duration.[259] In contrast, a

---

256. *See* sources cited *supra* note 104.

257. *See, e.g.*, Younger v. Harris, 401 U.S. 37, 44 (1971) ("This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."); La. Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 28 (1959) (stating that abstention "reflect[s] a deeper policy derived from our federalism"); R.R. Comm'n v. Pullman Co., 312 U.S. 496, 500 (1941) ("Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies.").

258. *See, e.g.*, *Pullman*, 312 U.S. at 501 (describing abstention as a matter of "wise discretion" that rests on "considerations of policy" (quoting Cavanaugh v. Looney, 248 U.S. 453, 457 (1919))).

259. For example, *Pullman* abstention enjoins federal courts from adjudicating cases only for long enough to give state courts enough time to determine whether they can be addressed on state-law grounds. *Id.* ("If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation; the constitutional issue does not arise. . . . Or, if there are difficulties in the way of this procedure of which we have not been apprised, the issue of state law may be settled by appropriate action on the part of the State to enforce obedience to the order."). Abstention is only warranted when state courts can resolve the dispute "with full protection of the constitutional claim," *id.*, and federal district courts may retain jurisdiction "pending a [state court] determination of proceedings, to be brought with reasonable promptness," *id.* at 501-02. The *Younger* abstention only prevents federal courts from "stay[ing] or enjoin[ing] pending state-court proceedings except under special circumstances," *Younger*, 401 U.S. at 41, or granting "declaratory relief . . . when a prosecution involving the challenged statute is pending in state court at the time the federal suit is initiated," *id.* at 41 n.2, not from adjudicating the underlying merits issues once state court proceedings have concluded. Likewise, the *Colorado River* abstention requires federal courts to dismiss cases when parallel proceedings are being carried out in state courts only in certain "limited" circumstances. Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 818 (1976) ("[T]he circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration," though "considerably more limited than the circumstances appropriate for abstention . . . do nevertheless exist."). It too does not prevent federal courts from adjudicating cases once

THE YALE LAW JOURNAL                                    125:1364   2016

doctrine barring federal courts from deciding domestic-relations cases would seemingly amount to a blanket, perpetual bar to adjudicating them. Were the Supreme Court to hold the domestic-relations exception inapplicable to federal questions, could federal courts revive it through abstention, thereby obviating the decision's practical significance?

The constitutionality of a domestic relations abstention doctrine depends on how broadly it is formulated. To preserve states' autonomy in defining family policy and leave resolution of family-law issues to state courts,[260] such a doctrine must give state courts leeway to decide federal questions involving domestic relations differently than would federal courts hearing identical cases. For example, if a federal court would strike down a paternity statute as violative of the Due Process Clause,[261] a domestic relations abstention doctrine must permit a state court to uphold it. The doctrine would hardly promote federalism if it required state courts to rule exactly as federal courts would. To have teeth, state courts must be free to disregard how federal courts would handle domestic-relations cases, even those raising federal questions, just as they are not bound by federal court pronouncements of state-law questions made pursuant to diversity jurisdiction.[262]

---

state proceedings have concluded. Under the *Burford* abstention, federal courts abstain out of "proper regard for the rightful independence of state governments in carrying out their domestic policy," Burford v. Sun Oil Co., 319 U.S. 315, 318 (1943) (quoting Pennsylvania v. Williams, 294 U.S. 176, 185 (1935)), but "ultimate review of the federal questions is fully preserved," *id.* at 334. Finally, the *Thibodaux* abstention merely permits state courts to construe state statutes concerning "matter[s] close to the political interests of a State" before federal courts weigh in; "[t]here is only postponement of decision for its best fruition." *Thibodaux*, 360 U.S. at 29.

260. Both of these rationales are central to the domestic-relations exception. *See supra* Section II.B.

261. U.S. CONST. amend. XIV, § 1.

262. *See, e.g.*, Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 983-84 (2005) (recognizing that state courts are not bound in interpreting state law by prior federal-court interpretations); Cambria-Stoltz Enters. v. TNT Invs., 747 A.2d 947, 952 (Pa. Super. Ct. 2000) (holding that Pennsylvania state courts are not bound by the Third Circuit's construction of state law). Under this principle, lower federal court opinions should be reversed if an intervening state-court decision has changed the state law. *See* Nolan v. Transocean Air Lines, 365 U.S. 293, 295-96 (1961) (setting aside a judgment of a lower federal court because the relevant state law had changed since the U.S. district court handed down its ruling); Huddleston v. Dwyer, 322 U.S. 232, 236 (1944) ("[A] judgment of a federal court ruled by state law and correctly applying that law as authoritatively declared by the state courts when the judgment was rendered, must be reversed on appellate review if in the meantime the state courts have disapproved of their former rulings and adopted different ones."); Vandenbark v. Owens-Ill. Glass Co., 311 U.S. 538, 543 (1941) ("[N]isi prius and appellate tribunals alike should conform their orders to the state law as of the time of the entry. Intervening and conflicting decisions will thus cause the reversal of judgments which were correct when entered.").

At stake in every federal-question case is a right or interest that federal law protects.[263] When a court reaches the wrong result, it wrongly, if inadvertently, deprives the losing party of that right or interest. For reasons discussed in Section III.A.2, federal judges are generally likelier than state judges to safeguard rights and interests that federal law protects.[264] They enjoy more judicial independence, have a national pedigree, speak on the entire nation's behalf, and are accountable, via impeachment, to the nation as a whole rather than to any one state.[265] By cutting off access to a federal forum,[266] a domestic relations abstention doctrine would virtually ensure that deprivations of such rights and interests occur more frequently. The only instances in which this concern would not arise are cases in which federal and state courts would reach identical outcomes on federal questions. In such cases, the exception serves little purpose anyway; it cannot be justified on the grounds that it relies on state courts' unique expertise or preserves states' autonomy to develop their family law in ways that federal courts would not.

The constitutionality of an abstention-doctrine formulation of the domestic-relations exception thus depends on whether the doctrine preserves a role for federal courts as the final expositors of the meaning of federal law. At a minimum, such a doctrine could not divest the Supreme Court of the power to review federal questions; as explained earlier, Article III requires that federal courts have the last word on questions of federal law subject to Supreme Court review. Merely allowing losing parties in state courts to seek a writ of certiorari would also not suffice, because grants of certiorari are rare, and denials do not

---

Federal courts exercising diversity jurisdiction are supposed to resolve state-law questions as would state courts. *See* Guar. Tr. Co. of N.Y. v. York, 326 U.S. 99, 109 (1945) ("[I]n all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."); Benjamin C. Glassman, *Making State Law in Federal Court*, 41 GONZ. L. REV. 237, 238 (2006) ("[T]he task of the federal court is to predict how the state supreme court would decide the issue."); *see also* Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.").

**263.** *See* Amar, *Two-Tiered Structure*, *supra* note 214, at 1530-31.

**264.** *See* Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 235-37; *supra* Section III.A.2.

**265.** *See* Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 230-37.

**266.** Ordinarily, litigants can elect to adjudicate federal-question disputes in federal forums. The plaintiff can file in federal court, *see* 28 U.S.C. § 1331 (2012), while the defendant can remove a case to federal court, *see, e.g.*, *id.* § 1441(a).

reflect judgments on the merits.[267] Thus, federal-court review would be unavailable in the vast majority of domestic relations federal question cases.

A constitutionally adequate domestic relations abstention doctrine could take one of at least three forms. First, lower federal courts could abstain entirely from hearing federal questions involving domestic relations if the Supreme Court exercised mandatory review over them. Not only would this approach likely require amending the Supreme Court Case Selections Act of 1988, which eliminated appeals as of right from state courts to the U.S. Supreme Court,[268] but it would also be very unwise. The purpose of the 1988 Act, as well as the earlier Judiciary Act of 1925,[269] was to give the Court greater discretion and control over its docket. By 1925, the Court's docket had become "overwhelmed" by congestion that "threatened the Court's ability effectively to carry out its functions."[270] By 1988, the docket had once again reached the point where "the burdens imposed on the Justices [had] become too great for the country's good."[271] Giving every litigant in a domestic relations federal question case a right of appeal to the Supreme Court would deluge its docket with cases that are unworthy of its attention. Time constraints would inevitably require the Court to resolve most of these cases through summary dispositions,[272] with little to no genuine deliberative consideration.

---

267. *See, e.g.,* Daniels v. Allen, 344 U.S. 443, 492 (1953) ("We have repeatedly indicated that a denial of certiorari means only that, for one reason or another which is seldom disclosed, and not infrequently for conflicting reasons which may have nothing to do with the merits and certainly may have nothing to do with any view of the merits taken by a majority of the Court, there were not four members of the Court who thought the case should be heard."); United States v. Carver, 260 U.S. 482, 490 (1923) ("The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times.").

268. Supreme Court Case Selections Act of 1988, Pub. L. No. 100-352, § 3, 102 Stat. 662, 662 (codified at 28 U.S.C. § 1257).

269. Act of Feb. 13, 1925, ch. 229, 43 Stat. 936 (codified as amended in scattered sections of 28 U.S.C.).

270. Arthur D. Hellman, *The Business of the Supreme Court Under the Judiciary Act of 1925: The Plenary Docket in the 1970's*, 91 HARV. L. REV. 1711, 1712 (1978) (describing the status quo prior to the Judiciary Act of 1925, a description that also fits the pre-1988 Act status quo); *see* FELIX FRANKFURTER & JAMES M. LANDIS, THE BUSINESS OF THE SUPREME COURT: A STUDY IN THE FEDERAL JUDICIAL SYSTEM 203-16 (1928).

271. Hellman, *supra* note 270, at 1713.

272. Unlike denials of certiorari, summary dispositions have precedential value and are binding on lower courts. *See* Hicks v. Miranda, 422 U.S. 332, 344-45 (1975) ("[T]he lower courts are bound by summary decisions by this Court 'until such time as the Court informs [them] that [they] are not.'" (second and third alterations in original) (quoting Doe v. Hodgson, 478 F.2d 537, 539 (2d Cir. 1973))). For a discussion of the different purposes that summary dispositions can serve, see Alex Hemmer, *Courts as Managers:* American Tradition

Second, lower federal courts could allow state courts to exercise exclusive jurisdiction over all domestic-relations cases in the first instance, but take appeals from them once state proceedings have concluded. This approach would also require statutory change, as Congress has not given federal or appellate courts jurisdiction to hear appeals from state-court decisions.[273] However, it is consistent with existing abstention principles that prevent federal courts from adjudicating specific types of cases only until certain state-court proceedings have concluded, not beforehand.[274]

Finally, a domestic relations abstention doctrine could relegate federal courts to an even narrower role, adjudicating federal questions involving domestic-relations issues only on certification from state courts. On litigants' motion, state courts could certify federal questions for federal courts to resolve before entering judgment or while state appeals are still pending. Under this approach, federal review would be unavailable once the state court has entered judgment and no state-court appeals are pending. A state-court litigant's failure to seek certification of a federal question to a federal court might be deemed a waiver of her or his right to federal-court review. Limiting federal judicial review of federal questions involving domestic relations to the posture of resolving certified questions may not be wise, but it would probably satisfy the bare threshold for constitutionality. So long as an abstention-doctrine formulation of the domestic-relations exception preserved a meaningful role for federal courts to decide federal questions, it would probably pass constitutional muster.

### B. The Statutory Argument: Under Ankenbrandt, the Federal Jurisdictional Statutes Are Best Read as Not Creating a Domestic-Relations Exception to Federal-Question Jurisdiction

The modern canonical rationale for the domestic-relations exception's provenance, articulated in *Ankenbrandt v. Richards*, cannot justify applying the exception to federal questions. *Ankenbrandt* held that regardless of whether the exception inhered in the early jurisdictional statutes, federal courts widely recognized its existence by 1948, when Congress revised them.[275] The Court explained that Congress, believing that the exception already obtained and

---

Partnership v. Bullock *and Summary Disposition at the Roberts Court*, 122 YALE L.J. ONLINE 209 (2013).

**273.** Under current law, cases brought in state court can be heard in the federal judiciary only through a writ of certiorari. *See* 28 U.S.C. § 1257; *id.* §§ 1441-1455 (authorizing removal).

**274.** *See* sources cited *supra* note 259.

**275.** Ankenbrandt v. Richards, 504 U.S. 689, 700 (1992).

intending no change in the status quo, implicitly codified it in the revised statutes.[276]

But even if one accepts *Ankenbrandt*'s account as accurate, sound principles of statutory interpretation—indeed, the same principles that the Supreme Court invoked in *Ankenbrandt*—suggest that Congress has eliminated any statutory domestic-relations exception it might have created with respect to federal questions. To see why, one must look to subsequent legislative history; since amending the jurisdictional statutes in 1948, Congress has continued to revise them, presumably with the knowledge that federal courts regularly hear federal questions involving domestic-relations matters.[277] As a matter of statutory interpretation, federal courts presume that Congress is aware of how courts interpret its statutes, and that congressional silence in the face of judicial constructions constitutes ratification, at least insofar as Congress later amends the statute in question.[278] If congressional awareness of a particular federal

---

**276.** *Id.* Congress had presumably revised the jurisdictional statutes, the Court said, "with full cognizance of the Court's nearly century-long interpretation of the prior statutes, which had construed the statutory diversity jurisdiction to contain an exception for certain domestic relations matters." *Id.* "With respect to such a longstanding and well-known construction of the diversity statute, and where Congress made substantive changes to the statute in other respects," the Court reasoned, "we presume, absent any indication that Congress intended to alter this exception, . . . that Congress 'adopt[ed] that interpretation' when it reenacted the diversity statute." *Id.* at 700-01 (quoting Lorillard v. Pons, 434 U.S. 575, 580 (1978)).

**277.** The diversity-jurisdiction statute has been revised eight times since 1948. *See* Act of July 26, 1956, Pub. L. No. 84-808, 70 Stat. 658, *amended by* Act of July 25, 1958, Pub. L. No. 85-554, § 2, 72 Stat. 415, 415, *amended by* Act of Aug. 14, 1964, Pub. L. No. 88-439, § 1, 78 Stat. 445, 445, *amended by* Act of Oct. 21, 1976, Pub. L. No. 94-583, § 3, 90 Stat. 2891, 2891, *amended by* Act of Nov. 19, 1988, Pub. L. No. 100-702, §§ 201(a), 202(a), 203(a), 102 Stat. 4646, 4646, *amended by* Act of Oct. 19, 1996, Pub. L. No. 104-317, § 205(a), 110 Stat. 3847, 3850, *amended by* Act of Feb. 18, 2005, Pub. L. No. 109-2, § 4(a), 119 Stat. 4, 9-12, *amended by* Act of Dec. 7, 2011, Pub. L. No. 112-63, §§ 101-102, 125 Stat. 758, 758-59. The federal-question jurisdiction statute has been revised three times since 1948. *See* sources cited *infra* note 305.

**278.** *See, e.g.*, FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 144 (2000) ("Under these circumstances, it is evident that Congress' tobacco-specific statutes have effectively ratified the FDA's long-held position . . . ."); *Lorillard*, 434 U.S. at 580 ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 n.8 (1975) (explaining that Congress intended to ratify a prevailing judicial construction of Title VII of the Civil Rights Act of 1964 when it enacted a later statute); Flood v. Kuhn, 407 U.S. 258, 283-84 (1972) ("We continue to be loath . . . to overturn those cases judicially when Congress, by its positive inaction, has allowed those decisions to stand for so long and, far beyond mere inference and implication, has clearly evinced a desire not to disapprove them legislatively."); Nat'l Labor Relations Bd. v. Gullett Gin Co., 340 U.S. 361, 366 (1951) ("Under these circumstances it is a fair assumption that by reenacting without pertinent modification the provision with which we here deal, Congress accepted the construction placed thereon by the Board and approved by the courts."); Nat'l Lead Co. v. United States, 252 U.S. 140, 146-47 (1920) ("The reenacting of the drawback

court practice, coupled with a tacit affirmation of the status quo, can constitute acquiescence in that practice even as Congress formally remains silent on the matter, surely it can suffice to *repeal* the domestic-relations exception just as well as *create* it.

According to a leading treatise on statutory interpretation, "Where a statute has received a contemporaneous and practical interpretation, and is then reenacted as interpreted, the interpretation carries great weight and courts presume it is correct."[279] The treatise also says that "[p]rior judicial constructions have special force, and are *prima facie* evidence of legislative intent."[280] Two examples are illustrative. In 1922, the Court held that the Sherman Antitrust Act does not apply to Major League Baseball.[281] Fifty years later, it reaffirmed the baseball exemption on the grounds that "Congress, by its positive inaction . . . far beyond mere inference and implication, has clearly evinced a desire not to disapprove [it] legislatively."[282] When the FDA sought to regulate tobacco products after long disclaiming authority to do so, the Court held that "Congress' tobacco-specific statutes have effectively ratified the FDA's long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products."[283] Though "[a]t the time a statute is enacted, it may have a range of plausible meanings," the Court asserted that "subsequent acts can shape or focus those meanings" over time.[284]

If in 1948 the federal-question statute contained an implicit domestic-relations exception to federal-question jurisdiction, Congress has subsequently eliminated it. For decades, federal courts have regularly heard federal-question

---

provision four times, without substantial change, . . . amounts to an implied legislative recognition and approval of the executive construction of the statute . . . for Congress is presumed to have legislated with knowledge of such an established usage of an executive department of the government."); United States v. Smith, 521 F.2d 957, 968 n.24 (D.C. Cir. 1975) ("Congress, which considered the FRE at great length, can be presumed to have been aware of the interpretation of the business records exception current in the courts when it approved Rule 803(6)."); Carroll Elec. Co. v. Snelling, 62 F.2d 413, 416 (1st Cir. 1932) ("[T]his considered opinion of an experienced and distinguished judge may fairly be regarded as adopted by the lawmaking body. We think that this construction was . . . adopted by Congress.").

279. 2B Norman Singer & Shambie Singer, Sutherland Statutes and Statutory Construction § 49:8 (7th ed. 2014).

280. *Id.* (footnote omitted).

281. Fed. Base Ball Club v. Nat'l League, 259 U.S. 200, 208-09 (1922).

282. *Flood*, 407 U.S. at 283-84.

283. *Brown & Williamson*, 529 U.S. at 144.

284. *Id.* at 143.

cases raised in core domestic-relations contexts, such as divorce,[285] visitation rights,[286] paternity,[287] legitimacy,[288] child custody,[289] alimony,[290] adoption,[291]

**285.** *See, e.g.*, Sosna v. Iowa, 419 U.S. 393, 409-10 (1975) (upholding a state statute imposing a one-year residency requirement for persons petitioning for divorce as consistent with the Due Process Clause); Boddie v. Connecticut, 401 U.S. 371, 380-83 (1971) (striking down a law conditioning the right to obtain a divorce on ability to pay court fees as inconsistent with the Due Process Clause with respect to the indigent).

**286.** *See, e.g.*, Troxel v. Granville, 530 U.S. 57, 75 (2000) (striking down a state visitation rights statute on the grounds that it violated the petitioner's substantive "due process right to make decisions concerning the care, custody, and control of her daughters").

**287.** *See, e.g.*, Michael H. v. Gerald D., 491 U.S. 110, 130 (1989) (holding a state paternity statute consistent with the Due Process Clause); Clark v. Jeter, 486 U.S. 456, 465 (1988) (striking down, under the Equal Protection Clause, a state statute of limitations on paternity actions).

**288.** *See, e.g.*, Trimble v. Gordon, 430 U.S. 762, 776 (1977) (striking down, under the Equal Protection Clause, a state law that prohibited illegitimate children from inheriting from their fathers by intestate succession); Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 175-76 (1972) (holding that a state workman's compensation law that denied rights to a dependent's unacknowledged illegitimate children violated the Equal Protection Clause).

**289.** *See, e.g.*, Chafin v. Chafin, 133 S. Ct. 1017, 1027-28 (2013) (wading into a custody dispute to decide a question of Article III mootness); Palmore v. Sidoti, 466 U.S. 429, 434 (1984) (reversing a state court's grant of custody to the child's father because the state court had considered the possible injurious effects of private racial bias on the child in violation of the Equal Protection Clause); Santosky v. Kramer, 455 U.S. 745, 769 (1982) (holding that under the Due Process Clause, a state must support its allegations by at least a clear and convincing evidence standard before permanently terminating parental rights); Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 856 (1977) (upholding, under the Due Process Clause, state regulations concerning the removal of foster children from foster homes); Stanley v. Illinois, 405 U.S. 645, 658-59 (1972) (striking down, under the Due Process Clause, a state law declaring children of unmarried fathers to be state wards upon the death of their mother). In 2013, the Court resolved a child-custody dispute on statutory grounds. Adoptive Couple v. Baby Girl, 133 S. Ct. 2552, 2565 (2013) (interpreting a federal statute relating to custody proceedings involving American Indian children). It has also resolved a custody dispute on treaty grounds. Abbott v. Abbott, 560 U.S. 1, 22 (2010) (upholding a lower court ruling against a father seeking the return of his child under a treaty).

**290.** *See, e.g.*, Orr v. Orr, 440 U.S. 268, 283 (1979) (striking down a state alimony law that imposed obligations on husbands but not wives as violative of the Equal Protection Clause).

**291.** *See, e.g.*, Lehr v. Robertson, 463 U.S. 248, 265, 267 (1983) (holding that the failure to notify a putative father of pending adoption proceedings did not violate the Due Process Clause or Equal Protection Clause where the father never sought to establish a substantial relationship with his child); Caban v. Mohammed, 441 U.S. 380, 394 (1979) (striking down, under the Equal Protection Clause, a state law that let an unwed mother—but not an unwed father—block the adoption of their child); Quilloin v. Walcott, 434 U.S. 246, 256 (1978) (upholding a state law prohibiting the father of an illegitimate child, who had never attempted to legitimate said child, from contesting the child's adoption by the mother's husband under the Due Process Clause and Equal Protection Clause).

and marriage.[292] Collectively, this enormous body of case law includes both cases that originated in state courts before making their way to the U.S. Supreme Court[293] and cases that were initially filed in federal court.[294] The federal courts that presided over these important cases all seemingly took for granted that the domestic-relations exception did not apply.

As Congress revised the jurisdictional statutes over time, it surely knew that federal courts regularly heard federal questions involving domestic relations, as this case law spans some of the most consequential constitutional decisions ever. These decisions include seminal substantive due process cases. *Boddie v. Connecticut* held that states cannot condition an indigent person's right to obtain a divorce upon the payment of a fee.[295] *Zablocki v. Redhail* held that states cannot prohibit noncustodial parents who are in arrears on child support from marrying.[296] *Michael H. v. Gerald D.* found that the relationship between a natural father and his child "born into a woman's existing marriage with another man"[297] is not "a protected family unit . . . [or otherwise] accorded special protection."[298] *Troxel v. Granville* said that a state court's broad application of a nonparental visitation statute infringed on the basic right of parents to make child-rearing decisions.[299]

These cases also include some of the most important equal-protection cases in history. *Trimble v. Gordon* struck down an intestate succession law that discriminated against illegitimate children.[300] *Orr v. Orr* invalidated alimony

---

292. *See, e.g.*, Zablocki v. Redhail, 434 U.S. 374, 390-91 (1978) (striking down a state statute requiring noncustodial parents who are obligated to pay child support to receive a court approval order before marrying in or out of state). One might think that *Loving v. Virginia*, 388 U.S. 1 (1967), would be on point. However, *Loving* involved a *criminal* statute, *id.* at 4, and "[c]riminal cases are and always have been understood as being cases in law or equity both in England and in the United States," Calabresi & Sinel, *supra* note 25, (manuscript at 5). Likewise, *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), involved a challenge to a *criminal* ordinance limiting occupancy of a dwelling to a nuclear family, *id.* at 496-97, so *Moore*, too, is not the sort of case to which the domestic-relations exception might apply.

293. *See, e.g.*, Troxel v. Granville, 530 U.S. 57 (2000); Michael H. v. Gerald D., 491 U.S. 110 (1989); *Palmore*, 466 U.S. 429; *Orr*, 440 U.S. 268.

294. *See, e.g.*, Chafin, 133 S. Ct. 1017; *Zablocki*, 434 U.S. 374; *Org. of Foster Families for Equal. & Reform*, 431 U.S. 816; Sosna v. Iowa, 419 U.S. 393 (1975); Boddie v. Connecticut, 401 U.S. 371 (1971).

295. 401 U.S. at 382-83.

296. 434 U.S. at 388-91.

297. 491 U.S. at 125.

298. *Id.* at 124.

299. Troxel v. Granville, 530 U.S. 57, 75 (2000).

300. Trimble v. Gordon, 430 U.S. 762, 776 (1977).

statutes that imposed duties on husbands but not on wives.[301] *Palmore v. Sidoti* nullified a child-custody award to a father made on the grounds that the mother's choice to enter a relationship with a black man would cause the child to suffer social stigma;[302] noting that "[p]rivate biases may be outside the reach of the law," the Court nonetheless held "the law cannot, directly or indirectly, give them effect."[303]

To be sure, the fact that the Court has decided these cases is not alone sufficient to prove that the domestic-relations exception does not apply to federal-question cases. The fact that a Supreme Court case suffers from a jurisdictional defect does not mean that it is not good law once decided. However, Congress has never indicated that it believes these cases to be jurisdictionally defective. Under *Ankenbrandt*'s own reasoning, therefore, we can presume that Congress accepted and implicitly ratified the jurisdictional assumption undergirding these decisions—that federal courts may adjudicate federal questions raising domestic-relations issues.

The implied-ratification principle is based on a belief that "a legislature is familiar with a contemporaneous interpretation . . . and therefore impliedly adopts the interpretation upon reenactment."[304] Congress amended the federal question jurisdiction statute three times after 1948, most recently in 1980.[305] During this period, federal courts interpreted that statute to confer jurisdiction over federal questions raising domestic-relations issues. Congress knew of this construction, but never expressed disapproval by doing what one would expect it to do if it felt that federal courts were exceeding their jurisdictional boundaries: make the exception statutorily explicit. Rather, it continued to amend the federal question jurisdiction statute periodically. Based on *Ankenbrandt*'s reasoning, then, we can presume that Congress believed that the proper scope of federal jurisdiction encompassed federal questions involving domestic-relations matters.

None of this is to suggest that "congressional *inaction*" regarding the exception "indicates specific congressional intent."[306] Congress's periodic amendments to the federal-question statute were affirmative legislative *actions*,

---

**301.** Orr v. Orr, 440 U.S. 268, 271 (1979).

**302.** Palmore v. Sidoti, 466 U.S. 429, 430-31, 434 (1984).

**303.** *Id.* at 433.

**304.** *See* 2B SINGER & SINGER, *supra* note 279, § 49:8.

**305.** Act of July 25, 1958, Pub. L. No. 85-554, § 1, 72 Stat. 415, 415, *amended by* Act of Oct. 21, 1976, Pub. L. No. 94-574, § 2, 90 Stat. 2721, 2721, *amended by* Act of Dec. 1, 1980, Pub. L. No. 96-486, § 2(a), 94 Stat. 2369, 2369; Ankenbrandt v. Richards, 504 U.S. 689, 700 (1992).

**306.** *See* Barbara Ann Atwood, *Domestic Relations Cases in Federal Court: Toward a Principled Exercise of Jurisdiction*, 35 HASTINGS L.J. 571, 588 (1984).

enacted via bicameralism and presentment.[307] Nor is it relevant that Congress may not have realized it was eliminating the exception. Congress, observing that federal courts regularly adjudicated federal questions involving domestic relations, may have concluded that the exception did not presently reach federal questions in the first place. In eliminating the domestic-relations exception to federal-question jurisdiction, Congress may have thought it was simply affirming the status quo, rather than effecting any change in law. Indeed, under *Ankenbrandt*'s logic, this is just what happened in 1948, when Congress first created the exception even though it believed itself to be merely preserving a preexisting domestic-relations exception.[308]

Some courts treat "Congress' failure *explicitly* to reject the [exception] as congressional acquiescence in the domestic relations exception."[309] For example, the Second Circuit concluded that "[m]ore than a century has elapsed since the *Barber* dictum without any intimation of Congressional dissatisfaction. It is beyond the realm of reasonable belief that, in these days of congested dockets, Congress would wish the federal courts to seek to regain territory . . . ."[310] However, according to *Ankenbrandt*, Congress created the exception only by implication.[311] Under that reasoning, Congress may repeal the exception implicitly as well.

Under *Ankenbrandt*'s logic, Congress periodically amended the federal question jurisdiction statute since 1948 knowing that federal courts regularly adjudicated federal questions raising domestic-relations issues, yet never manifesting any disapproval. The reasonable conclusion to draw from this is that as Congress revised the statute, it implicitly acquiesced in this practice.

### C. The Federalism-Based Argument: Applying the Exception to Federal Questions Undermines Federalism Values

Finally, permitting federal courts to hear federal-question cases that involve domestic relations better serves the values of federalism and state-federal court parity than giving state courts exclusive jurisdiction over such cases. At its core,

---

307. Congress may only change the law via bicameralism and presentment. *See, e.g.*, U.S. CONST. art. I, § 7, cls. 2-3; Clinton v. City of New York, 524 U.S. 417, 438 (1998); INS v. Chadha, 462 U.S. 919, 945-51 (1983).

308. *See Ankenbrandt*, 504 U.S. at 700 (asserting that Congress intended "no changes of law or policy . . . from [these] changes of language" (quoting Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 227 (1957))).

309. Atwood, *supra* note 306, at 588 (emphasis added).

310. Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, 490 F.2d 509, 514 (2d Cir. 1973).

311. 504 U.S. at 700.

the domestic-relations exception is all about federalism; it advances a claim regarding the deference due to state courts in an area that is at the core of their constitutional powers. If "the Constitution of the United States confers no power whatever upon the government of the United States to regulate marriage in the States, or its dissolution,"[312] then perhaps applying the exception to federal questions prevents the federalization of power over a subject that the Constitution exclusively commits to the states while simultaneously promoting respect for the role of the state courts as faithful guarantors of constitutional rights, just like their federal counterparts.

There are several objections to these parity and federalism-based defenses of the domestic-relations exception. Consider four arguments advanced in the exception's favor[313]: (1) "the [superior] competence and expertise of state courts in settling family disputes," (2) "the strong interests of the state in domestic relations matters," (3) "the risk of inconsistent federal and state court rulings in cases of continuing state court jurisdiction," and (4) "congested federal dockets." These rationales may make sense in the diversity context, but have little force in genuine federal-question cases that merely happen to "occur[] in a domestic setting."[314] State courts have neither special competence to decide matters of federal law nor special interest in the resolution of federal questions. Meanwhile, the Supreme Court enhances (rather than undermines) judicial uniformity when it settles contested federal questions by creating legal rules and standards for the entire nation. Docket congestion, always a problem for federal courts, is a poor excuse for stripping federal jurisdiction over cases raising significant problems of federal law.[315] Overall, "the prudential concerns underlying" the domestic-relations exception have little relevance in the federal-question context and "are completely absent" in constitutional cases, at least insofar as the court need not "exercise jurisdiction over or resolve any of those state law matters within the scope of the domestic relations exception."[316]

---

312. Andrews v. Andrews, 188 U.S. 14, 32 (1903), *abrogated by* Sherrer v. Sherrer, 334 U.S. 343 (1948).

313. Rush, *supra* note 22, at 8-9.

314. Moore, *supra* note 22, at 879; *see also id.* at 882 ("The mere fact that a claimed violation of constitutional rights took place in a domestic relations context should not bar a federal court from reviewing such constitutional issues.").

315. Perhaps recognizing this, at least one court has refused to apply the exception to a federal question notwithstanding docket-congestion threats. *See, e.g.*, Crouch v. Crouch, 566 F.2d 486, 488 (5th Cir. 1978) ("Because none of the rationales for the domestic relations exception obtain in this case—with the possible exception of congested federal dockets—we uphold the district court's exercise of jurisdiction and proceed to determine the merits.").

316. Hooks v. Hooks, 771 F.2d 935, 942 (6th Cir. 1985). This qualification is unremarkable, as federal courts generally are not supposed to resolve issues of state law; *cf.* Perry v.

One could go so far as to call parity "a dangerous myth," as Burt Neuborne does, which "provides a pretext for funneling federal constitutional decisionmaking into state courts precisely because they are less likely to be receptive to vigorous enforcement of federal constitutional doctrine."[317] The parity rationale, he suggests, would diminish "the capacity of individuals to mount successful challenges to [government] decisions."[318]

The parity rationale also places no coherent limit on Congress's power to curtail federal jurisdiction. According to Hart, Jr., Congress may abstain from creating inferior federal courts entirely[319] and limit the Supreme Court's appellate jurisdiction through the Exceptions and Regulations Clause.[320] Apparently "troubled by the breadth of this power,"[321] he suggests a hopelessly indeterminate limiting principle: "the exceptions must not be such as will destroy the essential role of the Supreme Court in the constitutional plan."[322] But what is the minimum that this "essential" role encompasses?

A bigger problem with the parity rationale is that it is rooted in an abstract, free-floating notion of federalism at odds with the specifics found in the Constitution's actual text. It "sidestep[s] the requirement that the judicial power *shall* be vested in *federal* courts and *shall* extend to *all* cases arising under the Constitution, laws and treaties of the United States."[323] Parity might be an attractive feature for a constitutional system to have, but the parity rationale ignores important textual features of the Constitution that we actually do have.

Most fundamentally, if parity is simply the recognition that "state and federal courts are functionally interchangeable forums likely to provide equivalent protection for federal constitutional rights,"[324] then it is not in tension with allowing federal courts to exercise jurisdiction over all federal questions. While it justifies allowing state courts to hear federal questions, it does not justify allowing them to be the *only* courts that may do so. Allowing *both* federal and state courts to hear federal questions better respects their equal "constitutional obligation to safeguard personal liberties and to uphold federal

---

Schwarzenegger, 628 F.3d 1191, 1193 (9th Cir. 2011) (certifying a question of state law to the California Supreme Court on which no controlling precedent existed).

**317.** Burt Neuborne, *The Myth of Parity*, 90 HARV. L. REV. 1105, 1105-06 (1977).

**318.** *Id.* at 1131.

**319.** Hart, *supra* note 174, at 1363-64.

**320.** *Id.* at 1364; *see also* U.S. CONST. art. III, § 2, cl. 2.

**321.** Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 216.

**322.** Hart, *supra* note 174, at 1365.

**323.** Amar, *Two Tiers of Federal Jurisdiction*, *supra* note 214, at 216.

**324.** Neuborne, *supra* note 317, at 1105.

law"[325] than giving state courts exclusive jurisdiction over such cases, which suggests state court *superiority* and federal court *inferiority* with respect to federal questions.

There is also good reason to believe that "the sovereign interests of the States and the Federal Government" may *not* be "coequal."[326] Our Constitution creates "a federal republic, conceived on the principle of a supreme federal power and constituted first and foremost of citizens, not of sovereign States."[327] The Supremacy Clause,[328] without which James Madison felt the Constitution "would have been evidently and radically defective,"[329] makes this clear. Even if federal and state governments are equal in the deference due to them, the domestic-relations exception, if understood to apply to federal questions, distorts the proper character of federalism in our constitutional system, one "adopted by the Framers of the Constitution and ratified by the original States."[330] The exception, so understood, transforms this system from a device that "secures to citizens the liberties that derive from the diffusion of sovereign power"[331] into a crude cudgel of states' rights. Federalism "has no inherent normative value: [i]t does not . . . blindly protect the interests of States from any incursion by the federal courts."[332] It is not about state primacy over the federal government; rather, it is about respecting the proper roles of both. For this reason, "it cannot lightly be assumed that the interests of federalism are fostered by a rule that impedes federal review of federal constitutional claims."[333]

## CONCLUSION

In the post-*Obergefell* world, federal courts will continue confronting cases in which they must decide whether or not to apply the domestic-relations exception to federal questions. If anything, now that same-sex marriage is the

---

325. Stone v. Powell, 428 U.S. 465, 494 n.35 (1976).

326. Coleman v. Thompson, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting).

327. *Id.*

328. U.S. CONST. art. VI, cl. 2.

329. THE FEDERALIST NO. 44, *supra* note 224, at 286 (James Madison).

330. *Coleman*, 501 U.S. at 759 (Blackmun, J., dissenting).

331. *Id.*; *see also* William J. Brennan, Jr., *Federal Habeas Corpus and State Prisoners: An Exercise in Federalism*, 7 UTAH L. REV. 423, 442 (1961) ("Federalism is a device for realizing the concepts of decency and fairness which are among the fundamental principles of liberty and justice lying at the base of all our civil and political institutions.").

332. *Coleman*, 501 U.S. at 759 (Blackmun, J., dissenting).

333. *Id.*

FEDERAL QUESTIONS AND THE DOMESTIC-RELATIONS EXCEPTION

law of the land, the incidence of such situations is likely only to increase. Recently, the Supreme Court reversed an order of the Alabama Supreme Court denying a lesbian woman's right to adopt three children she had raised with her former partner, a right that a Georgia court had granted the woman before the couple split up; the Court held that the Alabama court's order violated the Full Faith and Credit Clause.[334] As more gay and lesbian persons litigate claims under the U.S. Constitution or federal statutes that implicate divorce, child-custody arrangements, alimony awards, child support, and so on, federal courts will be presented with more opportunities to decide whether or not the exception applies to federal-question jurisdiction. These cases raise important questions of constitutional and federal statutory law, yet federal courts applying the domestic-relations exception to federal questions would refuse to adjudicate them.[335]

This Note advances a broad view of federal jurisdiction. It asserts that, under Article III, federal courts—and especially the Supreme Court—must have jurisdiction over *all* federal-question cases that arise in state or federal courts, including those arising in domestic-relations contexts. As a matter of ordinary statutory construction and constitutional interpretation, the domestic-relations exception does not and cannot bar federal courts from hearing cases that raise federal questions. When federal courts are called upon to decide important problems of federal law, questions as profound as whether the Constitution tolerates state laws that prohibit same-sex marriage, they should not shy away from their duty "to say what the law is."[336]

---

334. *See* V.L. v. E.L., No. 15-648, 2016 WL 854160 (U.S. Mar. 7, 2016) (per curiam).

335. Though this Note addresses only the domestic-relations exception, its analysis also carries heavy implications for the lawfulness of other doctrines that might be invoked to limit the scope of federal-question jurisdiction, including the probate exception to federal jurisdiction. *See* Markham v. Allen, 326 U.S. 490, 494 (1946) ("[A] federal court has no jurisdiction to probate a will or administer an estate . . . ."). Notably, in 2006, the Supreme Court narrowed the scope of the probate exception much as it had earlier narrowed the domestic-relations exception, expressly echoing *Ankenbrandt*. Marshall v. Marshall, 547 U.S. 293, 311 (2006) (confining the probate exception to "the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*"). Under the reasoning provided in this Note, applying the probate exception to federal questions would likely be unlawful, although this is ultimately a question for another day.

336. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).